STATE of Wisconsin, Plaintiff-Respondent,

v.

Dale H. CHU, Defendant-Appellant.†

Court of Appeals

*No. 01–1934–CR. Submitted on briefs February 25, 2002.—
Decided March 26, 2002.*

2002 WI App 98

(Also reported in 643 N.W.2d 878.)

† Petition to review denied 6-11-02.

668

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrew Shaw* of *Shaw Law Offices* of Milwaukee, and of counsel, *Rex R. Anderegg* of *Anderegg & Mutschler, L.L.P.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sarah K. Larson*, assistant attorney general.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J.   Dale Chu appeals from judgments entered on jury verdicts convicting him, as a party to a crime, of committing arson of both a building and property with the intent to defraud an insurer, contrary to Wis. Stat. §§ 943.02(1)(b), 943.04 and 939.05.[1] Chu argues that he was wrongfully subjected to racial ste-

---

[1] All statutory references are to the 1999–2000 version.

reotyping when the prosecutor referred to his Korean culture. He presents four additional arguments, relating to exculpatory evidence, sufficiency of the evidence, ineffective assistance of counsel and the trial court's admission of evidence. Finally, he seeks a discretionary reversal. We reject Chu's arguments and affirm the judgments.

## STATEMENT OF FACTS

¶ 2. Chu's convictions relate to a January 4, 1998, fire at one of several dry cleaning stores owned by Chu's parents, So Man and Sun Hee. The fire destroyed part of the building, as well as some machines and dresses that were in the store. Chu, who was a seventeen-year-old high school student in January 1998, often worked at the stores.

¶ 3. According to Belinda and Jeff VanDeLeygraaf, who lived in the house next to the store, a small car playing loud music pulled into the store driveway at approximately 8 p.m. The VanDeLeygraafs both testified that they saw three or four individuals near or in the car.

¶ 4. The VanDeLeygraafs saw an Asian male exit the store through the overhead garage door and get into the car. Then, the four individuals drove away. Jeff testified that he recognized the man as someone who drove the delivery van for So Man.

¶ 5. At approximately 8:30 p.m., two citizens driving past the store observed that it was on fire. They went to the VanDeLeygraafs' home and asked them to call 911. Officer Jeffrey Gross of the City of Appleton Police Department was dispatched to the store.

¶ 6. Upon arrival, Gross observed an open window on the east side of the building. The fire ultimately was extinguished, but not before it caused substantial

673

damage to the building and property inside, including machines and dresses. Law enforcement began an investigation to determine the cause of the fire. Investigators found no sign of forced entry and concluded that the open window indicated an attempt to the keep oxygen in the building so that the fire would burn.

¶ 7.  Eugene Reece, Deputy Fire Chief for the City of Appleton and one of the State's arson experts, testified that he and his team of investigators eventually ruled out electrical appliances, spontaneous combustion of chemicals, sunlight and accidental factors as causes of the fire. Reece's opinion was that the fire was intentionally set. Daniel Hughes, an independent fire investigator and another of the State's arson experts, held the same opinion.

¶ 8.  At the scene of the fire, Randy Cook, an investigator with the police department, discovered financial and court documents which prompted him to investigate a possible financial motive for the fire. Julie Russell, financial investigator for the police department, testified that So Man's business was in serious financial trouble in 1997. There were times in 1997 when So Man's business checking account was $30,000 overdrawn. Additionally, So Man did not make the $7,100 mortgage payment on his business for December 1997. There were also $87,000 in judgments against So Man, and the Wisconsin Department of Revenue had issued warrants against So Man for not paying taxes.

¶ 9.  Cook's investigation further revealed that So Man took out an additional $80,000 in insurance on his business two days before the fire. So Man ultimately submitted a claim to his insurance company for $499,030 in losses, which included $82,732 of bridal inventory, including tuxedos and dresses averaging about $400 apiece. None of the witnesses, however, saw

674

any tuxedos in the store, and only thirty-nine hangers containing burned dresses were found at the scene, compared to the 400 to 500 that So Man claimed were there. Some of the wedding dress tags that were not destroyed revealed that the dresses were obsolete and had been purchased at a low cost.

¶ 10. Additionally, the room where the dry cleaned clothing usually hung from the ceiling was virtually empty. Outside, the investigators found the customers' clothing stored in one of the store's delivery vans.

¶ 11. Ultimately, Chu was charged, as a party to a crime, with committing arson of both a building and property with the intent to defraud an insurer. The State's theory was that So Man and Chu planned the fire because So Man needed insurance money to recover from his financial difficulties. The State said that Chu set the fire when he and three other teens went to the store at approximately 8 p.m., and that the VanDe-Leygraafs saw him exit the building. In its opening statement, the State suggested that Chu's motive for helping his father was twofold. First, the State said Chu was devoted and loyal to his father, "particularly, because of his Korean culture." Second, the State said that Chu expected to someday take over the business.

¶ 12. The State also introduced two witnesses who said that Chu told them that he set the fire. Joanne Weiss, the owner of the house where Chu lived in the summer of 1999 and a "surrogate mother" of sorts to Chu, testified that Chu admitted to her that he had been involved in the fire. She explained that "he didn't come right out and say, I set fire to the building, but he had taken measures for the business to burn down. . . . . Dale said his dad had told him what to do." She said that

675

Chu told her that the business was failing and that they wanted to put in a bridal shop, but they needed the money to do so.

¶ 13. Nicholas Wales testified that he attended a party with Chu days after the fire. Wales said that Chu told him he burned down the store. Wales said Chu explained that he did so because his father was "hurting for money," had taken out a big insurance policy and had asked his two sons, Chu and Jay, and several others to burn the store. Wales also testified that a month or two later, Chu told him that he was nervous he was going to get caught.

¶ 14. Chu's defense was that he was not involved in the fire. Although Chu cross-examined the State's arson experts with respect to their conclusions about the cause of the fire, he offered no expert testimony to refute their opinions that the fire was intentionally set. Rather, his defense was that even if it was arson, there was no evidence that Chu was involved. He suggested that he had no involvement in the financial aspects of the business and that he had not made any insurance claims.

¶ 15. Chu testified that earlier in the day on January 4, his father, brother and others cleaned and covered machinery in preparation for remodeling in the store. While his family worked in the store, Chu and his cousin, Suk Won, delivered clothes to So Man's other stores. He said that they all left the store shortly before 7:30 p.m. to return to the Chu residence.

¶ 16. Chu testified that he, Jay, Won and a friend, Mark Nelson, soon returned to the store because they had forgotten they were supposed to retrieve a fire extinguisher and take it to another of So Man's stores. The young men rode in Chu's vehicle, with Chu driving. Chu said that when they arrived, Won got out of the

vehicle to retrieve the extinguisher from one of the vans parked outside the store, but no one entered the store.

¶ 17. The jury found Chu guilty, as a party to a crime, of committing arson of both a building and property with the intent to defraud an insurer. He was sentenced to seven years in prison and five years' probation, to be served consecutively. Chu filed several post-trial motions, all of which were denied. This appeal followed.

¶ 18. Chu presents six arguments: (1) his due process rights were violated when he was subjected to racial stereotyping; (2) his due process rights were violated when the State failed to provide exculpatory evidence concerning Weiss and Wales; (3) there was insufficient evidence to sustain the verdicts "because the State's experts and lay witnesses all had contradictory theories about how the fire started, none of which could be confirmed by the physical evidence from the fire site;" (4) his counsel provided ineffective assistance "by overlooking numerous deficiencies of the State's case and virtually embracing the State's theory of guilt;" (5) the trial court erroneously admitted highly prejudicial and improper evidence; and (6) this court should exercise its power of discretionary reversal and grant him a new trial. We reject these arguments and affirm the judgments.

D<span style="font-variant:small-caps">ISCUSSION</span>

## I. Racial stereotyping

¶ 19. Chu contends that his due process rights were violated when he "was subjected to racial stereotyping suggesting that Korean sons are automatons

677

who blindly carry out the orders of their fathers even when the orders involve criminal activity." Specifically, he objects to three instances where Chu's race or culture were referenced.

¶ 20.  First, in its opening statement the State said:  "The evidence will show in fact as part of his family setup, and more particularly, because of his Korean culture, [Chu] was very devoted and loyal to his father." Second, Weiss testified:

> I know that Dale would have to get something out of it, but his dad is the one that should be sitting in that chair. In my eyes, his dad is the one that is responsible. Dale was a 16–year old kid and in his culture and in Dale's beliefs, you just don't talk back to your parents, you don't – you do what your parents ask you to do.[2]

Finally, the State in closing argument stated:  "Dale Chu was—as a part of his life experiences, as part of his test of loyalty—was faced with the biggest test of loyalty of his life, loyalty on behalf of his dad. . . . . And he carries out that mission . . . . to get out of that tremendous bond."

¶ 21.  Although Dale did not object to these statements at trial, he argues that "the State's use of racial stereotype amounted to plain error, and mandates reversal of Dale Chu's convictions because the use of racial stereotypes could well have enflamed the jury and resulted in a verdict based on something other than the evidence."

¶ 22.  The State agrees that this court should review the remarks under a plain error analysis. *See State v. Street*, 202 Wis. 2d 533, 552, 551 N.W.2d 830 (Ct. App. 1996) ("plain error" must be obvious, substantial,

---

[2] Chu was actually 17 years old at the time of the fire.

and so fundamental that a new trial must be granted). However, the State contends that the statements by the prosecutor and Weiss were not improper. We agree.

¶ 23. Our conclusion is consistent with *Aliwoli v. Carter*, 225 F.3d 826 (7th Cir. 2000), where the seventh circuit recognized that although there is no place in a criminal prosecution for "gratuitous references to race," the State may properly refer to race where it is relevant to the defendant's motive. *See id.* at 831. Aliwoli was charged with attempting to kill three white police officers who stopped him for a routine traffic violation. *Id.* at 828. He pled not guilty by reason of insanity and presented expert witnesses who testified that Aliwoli suffered from a persecutorial delusional disorder that caused him to believe that police officers were members of a conspiracy to harass him. *Id.*

¶ 24. To refute Aliwoli's claims, the State sought to establish that Aliwoli's membership in the Muslim faith gave him a motive to shoot the three police officers. *Id.* at 830. The prosecutor questioned witnesses about Aliwoli's religious beliefs as a Muslim. *Id.* at 830–31. For example, the State cross-examined two of Aliwoli's expert witnesses by asking whether Aliwoli's Muslim faith encompassed an anti-authority stance. *Id.* Aliwoli was convicted.

¶ 25. On appeal, Aliwoli argued that the prosecutor's questions deprived him of a fair trial. *Id.* at 831. The seventh circuit rejected Aliwoli's claim, stating:

> We find no constitutional error in the prosecutor's questions. *As a general rule, a racial remark is improper if it is "intentionally injected into volatile proceedings where the prosecutor had targeted the defendant's ethnic origin for emphasis in an attempt to appeal to the jury's prejudices." [United States v. Her-*

*nandez*, 865 F.2d 925, 928 (7th Cir. 1989).] It is apparent from the context of the prosecutor's questions that the references to Aliwoli's membership in the black . Muslim faith were only meant to show that Aliwoli had a motive for shooting the police officers. In other words, the questions were clearly intended to rebut Aliwoli's insanity defense. Because the questions about Aliwoli's beliefs as a black Muslim focused solely on his state of mind and potential motive for the shootings, they were not improper. Although the questions mentioned Aliwoli's race and religion, none of them can be reasonably viewed as attempting to arouse jury prejudice towards blacks or Muslims. In short, there is no evidence that these comments were intended to play upon the prejudices of the jury.

*Id.* at 831 (emphasis added).

¶ 26. Similarly, we do not view the prosecutor's statements as an attempt to arouse jury prejudice toward Koreans. Rather, the statements were an attempt to preview and summarize evidence demonstrating that Chu had a motive for committing the arson: his personal belief, based on his upbringing and culture, that he should remain loyal to his family. Indeed, the jury heard evidence concerning Chu's individual beliefs, introduced through Weiss as admissions.

¶ 27. When Weiss testified about Chu's beliefs and his statements to her about the fire, she indicated that she had had conversations with Chu about his family makeup and the Korean culture. Then, the State asked her, "[H]ow did [Chu] describe it to you regarding his relationship with his father, So Man Chu?" She responded:

His—his relationship with his father is, as he grew older, he was supposed to take care of his dad. Dale has a lot of pride. He—he takes care of the people that he loves very well and would never, ever do anything

against his dad's wishes. To my understanding, if his father asked him to do something, he would do it.

¶ 28. Based on this testimony, it was not improper for the prosecutor to suggest that Chu held personal beliefs about family loyalty, based on his upbringing and culture, that suggest he would do as his father asked. The prosecutor did not ask the jury to find Chu guilty because he is Korean. Rather, the State suggested that Chu's beliefs gave him a motive to commit the arson to help his family and act consistently with his father's wishes. The statements do not constitute plain error.

## II. Exculpatory information concerning Weiss and Wales

¶ 29. Chu argues that his due process rights were violated when the State failed to provide him with crucial exculpatory information concerning Weiss and Wales. Under the Fourteenth Amendment to the United States Constitution, the prosecution's suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also State v. Nerison*, 136 Wis. 2d 37, 54, 401 N.W.2d 1 (1987).

¶ 30. The prosecution's duty to disclose evidence favorable to the accused includes the duty to disclose impeachment evidence as well as exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Such evidence is material, however, only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *See Kyles v. Whitley,* 514 U.S. 419, 434 (1995). On appeal, this court independently applies the *Bagley* constitutional standard to the undisputed facts of the case. *See State v. DelReal,* 225 Wis. 2d 565, 571, 593 N.W.2d 461 (Ct. App. 1999).

### A. Information concerning Weiss

¶ 31.   Chu argues that both the State and the trial court had an obligation to provide him with exculpatory evidence involving Weiss. Specifically, Chu contends that the State should have provided him with information concerning a deferred prosecution agreement and ordinance violations, all of which stemmed from a single incident where Weiss provided five minors with alcohol. Weiss was ultimately issued a ticket for five counts of providing alcohol to minors, an ordinance violation. She paid a $763 forfeiture.

¶ 32.   Additionally, in the course of responding to law enforcement's investigation of the matter, Weiss allegedly obstructed the investigation. She was charged with knowingly obstructing an officer, a class A misdemeanor. Weiss and the State entered into a deferred prosecution agreement that required Weiss to have no criminal violations during the agreement period and to contribute $100 to the Outagamie County Juvenile Diversion Program. The three-month agreement began on October 5, 1998. Because Weiss complied with the terms of the agreement, the charges were dismissed on January 19, 1999. The judge who approved the agreement and dismissed the case was the same judge that presided over this case.

¶ 33. Chu argues that the State should have provided him with information concerning the deferred prosecution and the ordinance violations prior to trial. He also argues that because the trial court had actual knowledge of Weiss's deferred prosecution, the court should have advised Chu of the information. Chu complains that the court did not stop or correct Weiss's testimony in order to comport with the facts concerning the deferred prosecution, and did not recuse itself.

¶ 34. In response, the State asserts that neither the deferred prosecution agreement nor the ordinance violations were disclosed because neither came to light in routine background checks on the State's witnesses. The State further argues that neither was required to be disclosed as *Brady* evidence and that neither had any bearing on the outcome of the trial. The State also maintains that there is no authority for Chu's assertion that the trial court had a duty to disclose information about Weiss.

¶ 35. First, we agree with the State that we should summarily reject Chu's argument that a trial court has an independent duty to disclose information about a prior case to a defendant. Chu offers no authority for this proposition and we decline to consider it further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (This court may decline to review issues which are inadequately briefed.).

¶ 36. Next, we conclude that Chu's due process rights were not violated because even if the State suppressed evidence favorable to Chu, the evidence was not material to the determination of his guilt. *See Brady*, 373 U.S. at 87. Specifically, evidence of the deferred prosecution agreement and the ordinance vio-

lations was not material because it was not admissible and, therefore, would not have affected the outcome of the trial. *See Bagley*, 473 U.S. at 682.

¶ 37.    As the State notes, prosecutions that end in dismissal and ordinance violations are not admissible to impeach a witness because they are not "evidence that the witness has been convicted of a crime." *See* Wis. Stat. § 906.09(1). Although Chu may be correct that the jury may have viewed Weiss differently if it had known about the prior incidents, he fails to explain how the evidence would have been admissible. It was not automatically admissible, and Chu does not identify grounds for its admissibility.

¶ 38.    Instead, Chu's entire argument is based on his premise that Weiss had a motive to lie on the witness stand because of the deferred prosecution agreement. He cites *United States v. Croucher*, 532 F.2d 1042, 1045 (5th Cir. 1976), for the proposition that prior arrests that have not led to a conviction may be used to demonstrate a witness's motive to strike a good bargain with the government. In doing so, he appears to argue that Weiss would lie to improve her bargaining position with the State with respect to charges arising from her arrest.

¶ 39.    Here, however, Weiss's criminal charge had been dismissed with prejudice by the time she testified.[3] Indeed, the charge was dismissed even before Chu made admissions to Weiss. Additionally, Weiss had already paid the forfeiture associated with the ordinance viola-

---

[3] Although the order of dismissal does not explicitly state that the charge was dismissed with prejudice, we will assume it was because dismissal with prejudice is required by statute. *See* Wis. Stat. § 971.39(1)(f) (upon completion of deferred prosecution agreement, the court shall dismiss the charge, with prejudice).

tions by the time of trial. Accordingly, Weiss had no need, and thus no motive, to strike any bargain with the government. To the extent Chu is attempting to argue that evidence of the deferred prosecution agreement would have been admissible to show Weiss's motive to lie, we reject his argument.

### B. Information concerning Wales

¶ 40.  Chu argues that the State failed to disclose evidence that Wales was being investigated for false swearing and that a police report recommended that he be prosecuted for obstruction of justice. The State disagrees, asserting that the relevant reports were disclosed to Chu's counsel prior to trial, and noting that the trial court found so at the *Machner* hearing.[4]

¶ 41.  In his reply brief, Chu offers no response to the State's argument concerning information about Wales. Unrefuted arguments are deemed admitted. *See Charolais Breeding Ranches v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). Accordingly, we reject his argument without further discussion.

### III. Sufficiency of the evidence concerning the cause of the fire

¶ 42.  Chu argues that there is insufficient evidence to sustain the jury's verdicts because "the State's experts and lay witnesses all had contradictory theories

---

[4] At the *Machner* hearing, Chu's trial counsel testified that although he was not sure exactly when he received the last supplement to the police reports, he did receive the information prior to trial. *See State v. Machner*, 101 Wis. 2d 79, 303 N.W.2d 633 (1981).

about how the fire started, none of which could be confirmed by the physical evidence from the fire site."[5] It is unclear whether Chu is disputing the jury's finding that the fire was intentionally set or asserting that the witnesses must agree precisely how the fire was intentionally set.

¶ 43.   Assuming Chu is arguing the former, we conclude there is credible evidence to support the jury's findings that someone intentionally damaged the building and property by means of fire. Both Reece and Hughes offered this opinion. Reece explained that his opinion was based on the elimination of possible causes of the fire, such as electrical or mechanical malfunction. He told the jury about the extensive investigation and the months of probing that went into his determination and, in doing so, offered credible evidence that sustains the jury's verdict. *See Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995).

¶ 44.   Chu may instead be arguing that the verdicts should be overturned because the State's experts could not agree on the precise method of starting the

---

[5] This appears to be the only basis upon which Chu challenges the sufficiency of the evidence in his opening brief. He does suggest that he would have prevailed if Cook and Wales had given more complete and truthful answers, but that is not a challenge to the sufficiency of the evidence. In his reply brief, he raises additional factual issues for the first time in support of his argument that "The facts of the case show that Dale Chu was wrongly convicted." We decline to address the new issues raised in Chu's reply brief. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492–93, 588 N.W.2d 285 (Ct. App. 1998) (appellate court will not address arguments raised for first time in reply brief).

fire, and because their testimony conflicted with Chu's alleged admissions about how he started the fire. One of the State's experts, Reece, testified that natural combustibles were used to start the fire. Another expert, Hughes, testified that dresses were doused with something and lit with a match, although he admitted that there was no physical evidence that any kind of flammable liquid was used. Chu also notes that Weiss gave conflicting testimony about what Chu allegedly told her about the specific method of starting the fire. Additionally, Wales testified that Chu said a rag was lit after it was placed in a can of paint thinner or ether paint.

¶ 45. We reject Chu's argument because the jury was required to determine *whether* the fire was intentionally set – not specifically *how* it was set. *See* WI JI-CRIMINAL 1405 and 1410. Here, the jury could find that the fire *was* intentionally set even if the witnesses disagreed precisely *how* the fire was intentionally set. *See State v. Toy*, 125 Wis. 2d 216, 222, 371 N.W.2d 386 (Ct. App. 1985) (The jury draws reasonable inferences from testimony, and it may choose to believe part of one witness's testimony and part of another's, even though the witnesses, as a whole, are inconsistent.).

## IV. Ineffective assistance of counsel

¶ 46. Chu argues that his trial counsel was ineffective because counsel "committed the most fundamental error of all by overlooking numerous deficiencies of the state's case and virtually embracing the state's theory of guilt." Specifically, Chu contends that his counsel failed to (1) retain an arson expert; (2) investigate Wales's and Weiss's backgrounds; (3) object to the State's use of racial stereotyping; and (4) object to other acts evidence. We reject Chu's first argument because we conclude counsel was not deficient. We reject his

remaining arguments because Chu failed to respond to any of the State's arguments in his reply brief.

¶ 47.   To establish ineffective assistance of counsel, a defendant must prove both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Smith*, 207 Wis. 2d 258, 273, 558 N.W.2d 379 (1997). Because the defendant must show both deficient performance and prejudice, reviewing courts need not consider one prong if the defendant has failed to establish the other. *See State v. Brewer*, 195 Wis. 2d 295, 300, 536 N.W.2d 406 (Ct. App. 1995).

¶ 48.   With respect to the "performance" prong of the test, a strong presumption exists that counsel acted properly within professional norms. *See Strickland*, 466 U.S. at 689. A defendant must demonstrate that his attorney made serious mistakes which could not be justified in the exercise of objectively reasonable professional judgment, deferentially considering all the circumstances from counsel's contemporary perspective to eliminate the distortion of hindsight. *See id.* at 689–91. Further, the defendant's own statements or actions may substantially influence the reasonableness of counsel's actions. *See State v. Pitsch*, 124 Wis. 2d 628, 637, 369 N.W.2d 711 (1985).

¶ 49.   An ineffective assistance of counsel claim is a mixed question of law and fact. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). On review, we examine a trial court's findings of fact concerning the circumstances of the case and counsel's conduct and

strategy under the clearly erroneous standard. *State v. Tulley*, 2001 WI App 236, ¶ 5, 248 Wis. 2d 505, 635 N.W.2d 807. However, whether counsel's performance was deficient and whether the deficient performance was prejudicial are questions of law that we review de novo. *Id.*

## A. Failure to retain an arson expert

¶ 50.   Chu argues that his trial counsel was deficient for failing to retain an arson expert, thereby embracing the State's theory that an arson had occurred. In closing argument, Chu's counsel stated that to argue that the fire was not intentionally set would be an insult to the jury's intelligence, but the fact that the fire may have been intentional did not prove that Chu started it. Counsel's testimony at the *Machner* hearing established that focusing on whether Chu was involved, rather than whether the fire was arson, was part of counsel's trial strategy. He explained, "Dale never particularly indicated to me that he didn't agree with it being characterized as an arson, his defense was, I didn't do it and beyond that I don't know who did."

¶ 51.   Additionally, counsel testified that Chu did not have the funds to hire an arson expert. Finally, counsel stated that he did not retain an arson expert because he believed an expert's conclusions might actually hurt his Chu's case.

¶ 52.   The trial court concluded that counsel was not deficient. The court stated:

> I do find [trial counsel's] testimony to be particularly credible here today about all of the issues he testified about. [He] explained his rationale for all of his actions

in this case, and he had good reasons, as he testified, for not hiring an arson expert. His client did not have sufficient funds. His other reasoning was that even if funds were expended, there was no guarantee whatsoever that the opinion would be anything different than the two opinions he saw by the State's expert witnesses.

These findings of fact concerning counsel's performance, based on the trial court's explicit credibility determination, are not clearly erroneous. Moreover, counsel's strategic choices, made after thorough investigation of the law and facts, are virtually unchallengeable. *See Strickland*, 466 U.S. at 690–91. We conclude that counsel was not deficient for failing to hire an arson expert.

### B. Other alleged deficiencies

¶ 53. Chu also argues that his trial counsel was deficient for failing to investigate Wales's and Weiss's backgrounds, object to the State's use of racial stereotyping and object to other acts evidence. In response, the State provides four pages of argument detailing why Chu's counsel was not deficient and why, in the alternative, Chu was not prejudiced. Chu's reply brief provides no response to these arguments. Accordingly, they are deemed admitted and we will not address them further. *See Charolais Breeding Ranches*, 90 Wis. 2d at 109.

### V. Challenges to the Admission of Evidence

¶ 54. Chu objects to several trial court rulings on evidence. Specifically, he argues that the trial court erroneously (1) admitted other acts evidence concern-

ing gangs, drugs and child support; (2) refused to allow the defense to cross-examine Wales about the entire contents of an affidavit; and (3) allowed Weiss to testify as an expert when she stated that she had training as a "criminal thinking specialist" and that she believes that Chu "uses a lot of criminal thinking." Once again, the State has provided a detailed analysis of each alleged error, devoting over five pages of its brief to its argument that the evidence was properly admitted and if not, that the admission of the evidence was harmless error. Chu provides no response to the State's arguments in his reply brief. We therefore deem the State's arguments admitted. *See id.*

## VI. Discretionary Review

¶ 55. Finally, Chu argues that this court should exercise its power of discretionary reversal under WIS. STAT. § 752.35 because it appears that the real controversy has not been fully tried and that justice has miscarried.[6] In order to establish that the real controversy has not been fully tried, Chu must convince us that the jury was precluded from considering important testimony that bore on an important issue or that certain evidence which was improperly received clouded

---

[6] WISCONSIN STAT. § 752.35 provides:

In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

a crucial issue in the case. *See State v. Darcy N.K.*, 218 Wis. 2d 640, 667, 581 N.W.2d 567 (Ct. App. 1998). To establish a miscarriage of justice, Chu must convince us there is a substantial degree of probability that a new trial would produce a different result. *See id.* An appellate court will exercise its discretion to grant a new trial in the interest of justice "only in exceptional cases." *State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983).

¶ 56.    Chu contends that the real controversy was not fully tried because of the undisclosed exculpatory evidence, the use of inaccurate racial stereotypes and wrongfully admitted other acts evidence, and for other reasons that we have already addressed. He states that justice has miscarried because the State's experts and lay witnesses contradicted each other with respect to the fire's cause and because trial counsel implied that Chu was guilty. For the reasons discussed above, we reject Chu's challenges to the convictions and further conclude that there is no reason to exercise our discretionary authority under WIS. STAT. § 752.35.

*By the Court.*—Judgments affirmed.