State of Wisconsin, Plaintiff-Respondent,
v.
William C. Ruleau, Defendant-Appellant.
No. 03-2117-CR.
Court of Appeals of Wisconsin.
Opinion Filed: July 22, 2004.
Before Deininger, P.J., Vergeront and Higginbotham, JJ.
¶1 VERGERONT, J.
William Ruleau appeals a judgment of conviction on five charges relating to a burglary and an order denying his motion for a new trial. He contends he received ineffective assistance of counsel, he was prejudiced by joinder of the charges related to another attempted burglary, and a new trial should be ordered in the interests of justice. We resolve each of these arguments against him and therefore affirm.

BACKGROUND
¶2 In the early morning of October 22, 2001, Helen's Edgewater Tavern in Marinette was broken into and a large safe weighing 920 pounds was stolen. The tavern's cash register tape showed an entry at 12:43 a.m., which police theorized was the approximate time of the break-in. Police were called to the tavern at approximately 4:00 a.m. They followed a trail that was apparently made as the safe was dragged behind a vehicle to a logging road outside Marinette. They found the safe in a wooded area off of this road and put the scene under surveillance. At about 9:00 a.m. officers observed two men, Ruleau and James Dulak, attempting to pry the safe open with a crowbar and maul. The officers surprised the men, who attempted to flee but were caught.
¶3 Both Ruleau and Dulak were charged with burglary as party to the crime, felony theft as party to the crime, and criminal damage to property. They were also charged with attempted burglary as party to the crime and criminal damage to property in connection with an attempted break-in at Brothers Three, a restaurant in Marinette. A burglar alarm there went off at approximately 12:25 a.m. on October 22, 2001.
¶4 At Ruleau's trial, the State called Dulak as a witness, and he testified under a grant of immunity. He stated he was not admitting any involvement in the theft of the safe, only to the criminal damage to property, and he denied knowing to whom the safe belonged. His account of how he and Ruleau came to be at the wooded area with the safe was as follows. He and Ruleau had planned the evening before to collect aluminum cans for money. Ruleau called him in the morning and told him to come right over and he picked Ruleau up in his mother's car. Ruleau told Dulak he had found something and directed him to the safe.
¶5 Ruleau did not testify. The primary theory of defense was that no direct evidence tied Ruleau either to the theft of the safe or to the attempted breakin at Brothers Three. In addition, the defense presented evidence that Ruleau was elsewhere during the general time period of those incidents. Ruleau's girlfriend testified that on the night of October 21, 2001, Ruleau left the house between 9:45 and 10:30 p.m. to go to the jail, where he had to report daily for a "breathalyzer test." She testified that he came back shortly before 12:30 a.m., they were in bed at 12:30, went to sleep, and woke up at 6:00 a.m. Ruleau's presence at the jail for testing the night of October 21 was corroborated by the testimony of an investigating officer called by the State. He testified on cross-examination that Ruleau arrived at the jail at 11:30 p.m. for drug testing, there was no recorded checkout time, and Ruleau was gone at the latest by 12:42 a.m. Finally, the defense attempted to show that Dulak was not credible and was implicated even more than Ruleau by the circumstantial evidence.
¶6 The jury found Ruleau guilty of the charges related to Helen's Edgewater Tavern but not guilty of the charges related to Brothers Three. After he was sentenced,[1] Ruleau filed a motion for a new trial, arguing that he received ineffective assistance of counsel, he was prejudiced by joinder of the charges, and in the interests of justice he deserved a new trial. After a Machner[2] hearing at which Ruleau's trial counsel testified, the trial court denied Ruleau's motion, and he appeals.

DISCUSSION

I. Ineffective Assistance of Counsel
¶7 Ruleau's primary argument is that he was denied effective assistance of counsel because his trial counsel did not object or move to strike unfavorable evidence on a number of occasions and failed to elicit favorable evidence. In particular he argues that his counsel was ineffective for: (1) failing to object to Dulak's testimony concerning drug use; (2) eliciting and then failing to mitigate the impact of testimony indicating that a warranty card for an item stolen in a previous burglary was found in Dulak's vehicle; (3) eliciting and failing to object to testimony that Ruleau had recently been incarcerated; (4) failing to object to the accomplice instruction given at trial; (5) allowing the State to elicit Dulak's invocation of his Fifth Amendment right not to incriminate himself; (6) failing to elicit testimony describing the details of Dulak's plea agreement; and (7) allowing the prosecution to elicit testimony that Ruleau did not always tell the truth.
¶8 In order to prevail on a claim for ineffective assistance of counsel, Ruleau must prove that trial counsel's performance was both deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance requires a showing that the identified acts or omissions of counsel fell below the objective standard of reasonableness under prevailing professional norms viewed at the time of counsel's conduct. State v. Hubert, 181 Wis. 2d 333, 339, 510 N.W.2d 799 (Ct. App. 1993). The identified acts or omissions must be "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Review of counsel's performance gives great deference to the attorney, and we make every effort to avoid determinations of ineffectiveness based on hindsight. State v. Johnson, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). The burden is upon the party asserting ineffectiveness to overcome the strong presumption that counsel acted reasonably within professional norms. State v. Brunette, 220 Wis. 2d 431, 446, 583 N.W.2d 174 (Ct. App. 1998).
¶9 Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. When there is more than one deficiency, we must look at the cumulative effect of the deficiencies to make a final determination whether they together undermine our confidence in the outcome of the trial. State v. Thiel, 2003 WI 111, ¶¶58-61, 264 Wis. 2d 571, 665 N.W.2d 305.
¶10 Whether trial counsel provided ineffective assistance is a mixed question of fact and law. Johnson, 153 Wis. 2d at 127. The trial court's determinations of what trial counsel did and did not do and the basis for the challenged conduct are factual, and we uphold factual findings unless they are clearly erroneous. Id. However, the ultimate determinations of whether trial counsel's performance was deficient and prejudicial are questions of law, which this court reviews de novo. Id. at 128. Since a defendant must show both deficient performance and prejudice, we resolve a claim against a defendant if he or she fails to establish either. Id.

A. Deficient Performance

1. Ruleau's Prior Drug Use
¶11 On direct examination, the prosecutor asked Dulak what he thought Ruleau was going to show him when Ruleau said he had found something. Dulak responded, "Either the aluminum cans or drugs." When asked why he thought they were going somewhere related to drugs, Dulak stated, "My whole life I've known Mr. Ruleau, and it's been a friendship based on doing drugs together, and in drug deals I've always known the less I know, the better."
¶12 Ruleau argues that the testimony concerning his past drug use was irrelevant and evidence of "other crimes, wrongs, or acts" that is generally excluded under WIS. STAT. § 904.04(2) (2001-02)[3] because of the danger that jurors will use evidence of the accused's other behavior to conclude he must be guilty of the crime charged. Therefore, he contends, defense counsel was deficient in not objecting to this testimony.
¶13 Ruleau's argument overlooks the fact that the prosecutor's questions were not aimed at eliciting information about Ruleau's drug use, but at how Dulak ended up at the safe with Ruleau, a proper line of inquiry. Dulak volunteered the information about Ruleau's drug usealso the information that he himself was an addict. The question, therefore, is whether defense counsel was deficient in not moving to strike Dulak's answers. A motion to strike involves different considerations than an objection to a question because the jury has already heard the information. Counsel therefore has to weigh the likelihood that the jury will in fact disregard what they have heard if they are so instructed against any negative effects from calling attention to the testimony, as well as other relevant considerations in the particular case.
¶14 At the Machner hearing, defense counsel testified he could not specifically remember what his thinking had been when Dulak testified about Ruleau's drug use. However, he thought he may have decided to let it go because Ruleau's going to the jail to be tested was an important part of the defense and the jury would therefore know anyway that Ruleau had either a drug or alcohol problem. Also, counsel recalled that Dulak was not being an effective witness at this point, and he may have decided to "not give him a chance to reinforce any of his or her answers, just kind of let him go out and hang himself."
¶15 We conclude counsel was not deficient for failing to strike Dulak's testimony concerning Ruleau's prior drug use. It was a reasonable defense strategy to present evidence that would place Ruleau at the jail as close as possible to the time periods of the two break-ins. To that end, defense counsel crossexamined the investigating officer on what Ruleau did after he arrived there at 11:30 p.m. in an effort to show that he was there as long as possible, that is, until 12:42 a.m., when a routine check of the jail did not indicate he was present. To do this, counsel went into detail on the nature of the testinga urinalysishow long it usually took, how long it took to get a sample from Ruleau on that night and so on. The jury had heard this officer's testimony before Dulak testified, and defense counsel knew that Ruleau's girlfriend would also be testifying about Ruleau going to the jail that night for testing. The jury therefore had reason to believe, apart from Dulak's testimony, that Ruleau had been involved with drugs. The record also bears out counsel's memory that Dulak was not being an effective witness at the point when he mentioned Ruleau's drug use: his answers were meandering, nonresponsive, and contradictory. Given that, and given that the jury would in any event have information from which it could infer that Ruleau had used drugs, we conclude it was not deficient performance not to move to strike Dulak's testimony on Ruleau's drug use.

2. Warranty Card
¶16 Investigator Peter Springer of the Marinette Police Department testified on direct examination about evidence the police recovered from the area around the safe, including a crowbar and an extension cord. Springer stated another officer got a search warrant for the vehicle parked at the scene. On crossexamination, defense counsel asked Springer what the police found in the car, and Springer stated they found a multi-purpose tire tool and a warranty card from a Motorola radio. Counsel asked whether Springer had a theory about the card, and Springer answered that there had been a prior burglary in which two Motorola radios had been taken and the card could possibly have been from one of those radios. Springer was later recalled and testified that the burglary of the radios occurred at least "a couple months" before October 22, 2001.
¶17 Ruleau argues that eliciting the testimony about the warranty card was deficient because at worst it implicated both Ruleau and Dulak in another burglary, and at best it allowed jurors to conclude Ruleau was closely associated with a burglar. We disagree. At the Machner hearing, defense counsel testified that his strategy concerning the warranty card was to show that the robbery with which it was supposedly connected occurred at a time when Ruleau could not have been involved because he was in jail. The point the defense wanted to make was that it was Dulak who was involved with this earlier burglary, not Ruleau, in order to persuade the jury that the same was true regarding the October 22 burglary and attempted burglary.
¶18 To this end, counsel elicited testimony from Ruleau's girlfriend that Ruleau was incarcerated for four months ending one week before October 22, 2001, and testimony from Springer that the radio burglary took place at least a couple months prior to the safe being stolen. During closing argument, defense counsel referred to this evidence and to the warranty card when he was listing for the jury the reasons it should not credit Dulak's testimony that Ruleau led him to the safe rather than the other way around. Giving the requisite deference to defense counsel's trial strategy, Johnson, 153 Wis. 2d at 127, we conclude this strategy was within the range of professionally competent assistance.

3. Prior Incarcerations
¶19 As we have already noted, defense counsel elicited from Ruleau's girlfriend testimony that Ruleau had been in jail four months ending one week prior to October 22, 2001. On cross-examination, the prosecutor asked her how long she and Ruleau had been living together. Her explanation of when they had lived together since November 1996 included the information that, in addition to the arrest preceding the four-month incarceration she had already mentioned, Ruleau had been arrested and incarcerated in May 2001 for a short period of time; he was released at the end of May or the beginning of June.[4]
¶20 Ruleau argues that his counsel provided ineffective assistance by eliciting the prior incarceration testimony from his girlfriend and by failing to move to strike the additional testimony on her cross-examination. We conclude neither was deficient performance. As we have already concluded, the strategy of showing that Ruleau was incarcerated at the time of the radio burglary was a reasonable defense strategy. Therefore, eliciting the evidence of the four-month incarceration and failing to move to strike reference to it on cross-examination is not deficient performance.
¶21 The additional period of incarceration in May 2001 was not relevant to that defense strategy and we see no other way in which it assisted Ruleau's defense. However, this information was volunteered by Ruleau's girlfriend in response to questions on how long she had lived with Ruleauquestions that were addressed to relevant matters and were not objectionable. The jury already knew about the four-month period of incarceration, which was part of a reasonable defense strategy. The additional period of incarceration was much shorter and a motion to strike would not have changed the fact that the jury had already heard the testimony. We conclude that defense counsel could reasonably decide that any benefit to Ruleau of striking the reference to this period of incarceration would have been minimal. We therefore conclude it was not deficient performance not to move to strike.

4. Accomplice Instruction
¶22 The prosecution and the defense agreed to have this instruction based on WIS JICRIMINAL 245 read to the jury:
You have heard testimony from James Dulak, who stated that he was involved in the crime charged against the defendant. You should consider this testimony with caution and great care, giving it the weight you believe it is entitled to receive. You should not base a verdict of guilty upon it alone unless, after consideration of all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty.
¶23 The purpose of this instruction is to caution juries to carefully evaluate the weight and credibility of the testimony of witnesses who have also been implicated in the crimes charged against a defendant, and it is generally considered favorable to the defense for that reason. See, e.g., Linse v. State, 93 Wis. 2d 163, 171-72 (1980). However, Ruleau points out that the instruction stated that Dulak testified he was involved in "the crime charged" against Ruleau, but Ruleau was actually charged with five crimes and Dulak admitted to being involved only in the crime of criminal damage to property. Ruleau argues that the instruction therefore presented jurors with a "judicial finding" that Dulak had committed all of the crimes charged, and this placed "a judicial imprimatur on the prosecution's theory that Dulak and Mr. Ruleau were accomplices in the charged offenses."
¶24 While we agree with Ruleau that the instruction could have been clearer by referring to the specific crime Dulak admitted committing, we conclude it is very unlikely the instruction led the jury to believe that Dulak admitted involvement in all five crimes. The instruction refers to a single crime ("the crime charged"); it was clear Ruleau was charged with five crimes; and it was clear Dulak admitted involvement in only the charge of criminal damage to property at Helen's Edgewater Tavern.
¶25 However, even if the jury had been misled by the instruction into believing Dulak admitted involvement in all five crimes, we do not see how that would have worked to Ruleau's disadvantage. The instruction itself does not refer to or suggest Ruleau's involvement in any of the charged crimes. The premise of Ruleau's argument appears to be that if the jury believed Dulak was involved, it would more likely believe Ruleau was involved. However, this premise is inconsistent with Ruleau's defense strategy at trial, which attempted to portray Dulak and not Ruleau as involved in the burglaries. Faced with Dulak's testimony that he was unwittingly led to the safe by Ruleau, the defense strategy was to question Dulak's credibility, which it did in a number of ways, including: pointing to the warranty card as evidence of a recent robbery found in Dulak's car that Ruleau could not possibly have committed; eliciting testimony from Dulak that the tools used in their attempt to break into the safe were from the trunk of Dulak's mother's car and Ruleau had no reason to know they were there; highlighting the inconsistencies and implausibilities in Dulak's testimony, such as the convoluted explanations of how a maul came to be in the trunk of the car and a crowbar happened to be at the site of the safe. We are satisfied this was a reasonable defense strategy within the range of professionally competent assistance.
¶26 Given the defense strategy, any misunderstanding the jury had that Dulak had admitted his involvement in all five crimes would only have benefited Ruleau. Therefore, we conclude failure to object to the instruction is not deficient performance.

5. Invocation of Fifth Amendment
¶27 In an argument related to the accomplice instruction, Ruleau asserts that defense counsel provided ineffective assistance by allowing the State to elicit from Dulak testimony that he was invoking his Fifth Amendment right not to incriminate himself.[5] The prosecutor then moved the court to grant Dulak use immunity, and the court granted the request. Ruleau argues that allowing Dulak to state he would invoke his Fifth Amendment right impermissibly led jurors to believe that Dulak was involved with the burglary and tied Ruleau to the crime as well.
¶28 As with Ruleau's argument on the jury instruction, we do not agree that the testimony of Dulak's invocation of his Fifth Amendment right prejudiced Ruleau. To the contrary, any statement by Dulak implying he took part in the burglary actually strengthened the chosen defense strategy of portraying Dulak as the one responsible for the burglary. Therefore, failing to object to this testimony does not constitute deficient performance.

6. Failure to Impeach Dulak with Plea Offer
¶29 Ruleau argues that defense counsel performed deficiently in failing to impeach Dulak's testimony by cross-examining him about evidence that he was engaged in plea negotiations with the State. Accompanying his motion in the trial court is a letter outlining the terms of a possible plea agreement, in which Dulak would plead no-contest to the burglary to Helen's Edgewater Tavern and testify truthfully against Ruleau in return for the prosecutor dismissing the other counts and at sentencing recommending not more than seven months in the county jail, five years of probation, restitution, payment of court costs and fees, and counseling. At the Machner hearing, defense counsel acknowledged that he had this letter at the time of trial but said he could not remember if Dulak had accepted this offer; he recalled some confusion whether Dulak was going to accept it or not. If Dulak had accepted this offer, in counsel's view, there was no question that he had made a mistake in not using this to impeach Dulak.
¶30 The State responds in part that defense counsel's view of his or her own conduct is not dispositive. This is a correct statement of the law. If counsel's trial tactics are objectively reasonable, they are not deficient even if counsel cannot explain them at a Machner hearing. State v. Koller, 2001 WI App 253, ¶53, 248 Wis. 2d 259, 635 N.W.2d 838. The State asserts that it was a reasonable defense strategy not to impeach Dulak based on the proposed plea agreement because doing so would have called attention to the provision stating Dulak would plead no contest to the Helen's Edgewater Tavern burglary, thus implicating Ruleau as well; in the State's view, Dulak's testimony was not as damaging to Ruleau as evidence of the plea agreement would be, because Dulak testified only that Ruleau said he found the safe, not that Ruleau had broken into the tavern.
¶31 The State's argument is not persuasive. The defense strategy at trial was to portray Dulak as the one who stole the safe rather than Ruleau, not to show that neither man had stolen the safe and later one of them found it. Given the defense strategy, it was of value to Ruleau to attack Dulak's trial testimony that he (Dulak) had nothing to do with the burglary and that it was Ruleau who said he found the safe. Knowledge that Dulak was involved in plea negotiations with the State would permit the jury to infer that Dulak was implicating Ruleau to gain an advantage in those negotiations. As Ruleau correctly points out, Dulak need not have accepted an offer at the time of his testimony in order for the evidence of negotiations to be relevant to his motive and bias. See State v. Delgado, 194 Wis. 2d 737, 751-53, 535 N.W.2d 450 (Ct. App. 1995). We therefore conclude it was deficient performance not to bring out at trial that Dulak was engaged in plea negotiations with the State regarding the charges against him.

7. Testimony that Ruleau Did Not Always Tell the Truth
¶32 On cross-examination of Ruleau's girlfriend, the prosecution asked whether Ruleau always told her the truth. Defense counsel objected on the grounds of relevancy and the court overruled the objection. She answered "no." Ruleau argues that this constituted improper character evidence under WIS. STAT. § 904.04(2) and is not admissible under WIS. STAT. § 906.08(2)[6] because Ruleau was not a witness. According to Ruleau, counsel's failure to object on the ground of §904.04(2) prejudiced his defense.
¶33 Ruleau does not develop his argument that the question was objectionable under WIS. STAT. § 904.04(2) with citation to any case law supporting his position. Section 904.04(2) makes inadmissible evidence of "other crimes, wrongs, or acts ... to prove the character of a person in order to show that the person acted in conformity therewith." The question the prosecutor asked does not appear to call for a description of any particular wrong or act and the answer did not reveal any particular wrong or act. We are therefore not persuaded, based on the argument presented to us, that defense counsel was deficient in failing to object to the question under § 904.04(2). However, the State does not argue that § 904.04(2) is inapplicable, but instead focuses on prejudice. We choose not to decide whether defense counsel was deficient on this ground but will instead include the prosecutor's question whether Ruleau always told the truth and the "no" answer in our prejudice analysis.

B. Prejudice
¶34 We now consider whether defense counsel's failure to crossexamine Dulak on plea negotiations and the "no" answer to the question whether Ruleau always told the truth undermines our confidence in the outcome of the trial. For the following reasons, we conclude there is not a reasonable probability that, but for that failure and the "no" answer, the result of the trial would have been different.
¶35 We begin with the failure to cross-examine Dulak on the plea negotiations. First, the jury had before it other evidence from which it could infer that Dulak had a motive to implicate Ruleau in the theft of the safe and deny his involvement. The charges against Dulak were read to the jury and the information was admitted into evidence. The jury did not need to be informed there were plea negotiations in order to surmise that Dulak had an incentive to deny his involvement in all of those charges except the one in which there was direct evidence.
¶36 Second, Dulak's credibility in general was undermined in a number of ways. A few examples suffice here. His explanation that he was on medication the morning of October 22 and thus could not remember certain things did not keep him from remembering other details that were helpful to him. His disabilities that he elaborated on in explaining how Ruleau was doing most of the damage to the safe did not interfere with his plans to go back to Alaska and live in the woods where he would need the maul he happened to have in the trunk. His testimony on when he had recently used his mother's car was self-contradictory. In short, his testimony in general was marked by non-responsive and evasive answers that elaborated on inconsequential details in a self-contradictory manner.
¶37 Third, Dulak's testimony that Ruleau led him to the safe was undermined in specific ways. As mentioned above, Dulak testified that the tools he and Ruleau used on the safe just happened to be in his mother's car, but he also testified that Ruleau would have had no reason to know about the tools. Had Ruleau actually found the safe without Dulak's knowledge and then led him to it with the intention of breaking into it, is unlikely that: (1) Ruleau would not have planned to bring any tools that could be used to break into the safe, and (2) tools capable of being used in this capacity would coincidentally be stored in the trunk of Dulak's mother's car without Dulak's knowledge. In addition, Dulak's testimony about what was in the trunk of the car and how the items came to be there was self-contradictory and inconsistent with the officer's testimony of what they found in the trunk when they apprehended Ruleau and Dulak. This was evidence from which the jury could decide that Dulak put the tools in the car because he knew he was going to the safe to try to break it open, but Ruleau did not know that.
¶38 In short, the reasons not to credit Dulak's testimony were plentiful even without evidence of plea negotiationsso plentiful that even the prosecutor argued in closing that Dulak could not be believed in his testimony about the tools.
¶39 Fourth, there was substantial evidence that Dulak and Ruleau together were responsible for the burglary at Helen's Edgewater Tavern. There was no evidence suggesting how either Dulak or Ruleau could have just happened to find the safe at the remote location in the time period between when it was brought there and when the site was put under surveillance. Thus, the only reasonable inference was that at least one of them had been involved in the burglaryand Ruleau's defense was that it had been Dulak. Ruleau effectively undermined Dulak's denial of his involvement, but there was uncontroverted evidence that made it unlikely that only one person was involved: the weight of the safe was established at 920 pounds and there was testimony that it would take at least two men to move it. In addition, there was uncontroverted evidence that strongly suggested that Ruleau was not unwittingly taken along by Dulak to the safe. Both men were wearing gloves at the scene of the safe. Ruleau took his gloves off and threw them as he ran away. They were later retrieved and found to be marked with the first and last initials of his girlfriend. The compelling inference from this evidence is that Ruleau, as well as Dulak, went to the woods with the purpose of opening the safe and wore gloves to avoid leaving fingerprints. It stretches the imagination to believe that Ruleau took his girlfriend's gloves along on a trip to collect aluminum cans in October. In addition, one of the arresting officers testified that after both were apprehended, Ruleau said loudly, directing his comment at Dulak, "We just found the safe," and Dulak repeated, "yes, we found the safe." The officer also testified that within a few minutes of being apprehended Ruleau volunteered to make a deal in which he would provide information of forty other burglaries. This evidence provides a solid basis for inferring that Ruleau was not simply an unsuspecting companion of Dulak in trying to open the safe, but was himself involved in stealing it.
¶40 In summary, the failure to cross-examine Dulak on the plea negotiations does not undermine our confidence in the outcome because the jury had many other persuasive reasons to doubt Dulak's credibility and, at the same time, had heard persuasive evidence that Ruleau, as well as Dulak, committed the burglary at Helen's Edgewater Tavern. Considering that failure in conjunction with Ruleau's girlfriend's testimony that Ruleau did not always tell the truth, our confidence in the outcome remains. Testimony from one who knows a person wellin this case a long-time girlfriendthat the person does not always tell the truth is so general in nature and so unsurprising as a generality that a jury is unlikely to attach any significance to it in evaluating a person's guilt for a crime. Indeed, it is very likely that Ruleau's girlfriend's "no" answer enhanced her credibility, which benefited Ruleau. After answering "no," she went on to affirm that she believed Ruleau when he told her he was colleting aluminum cans the morning of October 22.

II. Prejudicial Spillover from Brothers Three Charges
¶41 Ruleau argues that although he was acquitted on the attempted burglary and criminal damage to property charges concerning Brothers Three, allowing the jury to hear evidence concerning those charges along with the evidence of the Helen's Edgewater Tavern burglary "unnecessarily prejudiced the factfinding process." He relies on State v. McGuire, 204 Wis. 2d 372, 556 N.W.2d 111 (Ct. App 1996), for the proposition that it may be necessary to vacate a guilty verdict on a charged offense because the case was prejudiced by "spillover" evidence from an invalid charge, and that here the jury's exposure to the additional charges increased the danger of an unwarranted guilty verdict on the Helen's Edgewater Tavern charges. The State argues that McGuire is inapposite because in McGuire the defendant was convicted of more than one offense, with one of the convictions subsequently overturned, and the question was whether there was "retroactive misjoinder"whether the evidence from the overturned conviction prejudicially "spilled over," leading the jury to convict on the other count. Id. at 376. In contrast, Ruleau was acquitted of the Brothers Three counts. In his reply brief, Ruleau argues that allowing the evidence concerning the Brothers Three attempted burglary violated the principles prohibiting the admission of "other acts" evidence to prove a defendant acted in conformity therewith: the jury, faced with evidence of two separate break-ins, might conclude that the defendants were responsible for at least one.
¶42 Even if we assume without deciding that the principles underlying the "retroactive misjoinder" theory should also apply to a case in which the defendant is acquitted by the jury on the count alleged to produce "prejudicial spillover," we fail to see how Ruleau was prejudiced by the evidence related to the Brothers Three charges on which he was acquitted. In McGuire, we considered three factors to determine whether there is prejudicial spillover:
(1) whether the evidence introduced to support the dismissed count is of such an inflammatory nature that it would have tended to incite the jury to convict on the remaining count;
(2) the degree of overlap and similarity between the evidence pertaining to the dismissed count and that pertaining to the remaining count; and
(3) the strength of the case on the remaining count.
Id. at 379-80.
¶43 Ruleau admits that "the only evidence offered to link Mr. Ruleau to the [Brothers Three] attempted burglary was a metal bar found in the trunk of Dulak's mother's vehicle" and that "an expert from the State Crime Lab could not connect this item to the tool marks left at the crime scene." Ruleau argues that this lack of evidence makes the joinder of the counts "particularly prejudicial," but this reasoning fails to explain how, in the context of the first part of the McGuire test, a dearth of inflammatory evidence could serve to prejudice the jury. Ruleau's argument also ignores the third part of the McGuire test. As we have stated above, there was strong evidence linking Ruleau to the Helen's Edgewater Tavern burglary. There is no basis for believing that the jury convicted Ruleau of those charges because of the much weaker evidence on the charges on which it acquitted him. We conclude a new trial is not required due to the joinder of charges against Ruleau.

III. New Trial in the Interests of Justice
¶44 Ruleau argues that because of all the alleged errors we have already discussed, as well as the prosecutor's statement in his closing argument that it "wouldn't surprise" him if Ruleau had falsified a drug test at the jail the night of October 21, 2001,[7] the real controversy was not fully tried and a new trial should be ordered in the interests of justice.
¶45 Under WIS. STAT. § 752.35, we have the discretion to reverse a judgment "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." Our power under this section should be "exercised sparingly and with great caution." State v. Tainter, 2002 WI App 296, ¶23, 259 Wis. 2d 387, 655 N.W.2d 538. In order to establish that the real controversy was not fully tried, Ruleau must show that the jury was precluded from considering important testimony that bore on an important issue or that certain evidence which was improperly received clouded a crucial issue in the case. State v. Chu, 2002 WI App 98, ¶55, 253 Wis. 2d 666; 643 N.W.2d 878. Ruleau argues that both of these prongs are implicated in his case.
¶46 Ruleau fails to explain what important testimony was excluded from consideration from the jury that might satisfy the first prong, and we do not consider arguments not adequately briefed. Bille v. Zuraff, 198 Wis. 2d 867, 883, 543 N.W.2d 568 (Ct. App. 1995). To the extent he is referring to evidence of the plea negotiations, we have already concluded that there was other evidence from which a jury could conclude that Dulak had a motive to deny his involvement in the Helen's Edgewater Tavern burglary and implicate Ruleau. Therefore the absence of evidence of the plea negotiations did not prevent an important issue from being tried.
¶47 Moving to the question whether a crucial issue was clouded by improper evidence, Ruleau reiterates the arguments he made under his ineffective assistance of counsel claim, arguing "as a consequence of the repeated attacks upon Mr. Ruleau's character and the incomplete and misleading portrayal of Dulak's testimony, jurors may have concluded Mr. Ruleau was a burglar and thief and not simply an opportunist," especially because of the "circumstantial and thin" nature of the evidence against him. However, we have already concluded that the evidence Ruleau asserts should have been excluded or struck was either in keeping with a reasonable defense or not significant; and for the reasons we have already explained in analyzing the ineffective assistance of counsel claim, we do not agree that the evidence against Ruleau was "thin."
¶48 With respect to the prosecutor's closing argument, we question whether the prosecutor was, as Ruleau contends, asking the jury to consider facts not in evidence rather than asking it to draw an inference from the evidence. See State v. Neuser, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995) ("The line between permissible and impermissible argument is drawn where the prosecutor goes beyond reasoning from the evidence and suggests that the jury should arrive at a verdict by considering factors other than the evidence."). We also question whether a closing argument, even if improper, can constitute "evidence which was improperly received [and] clouded a crucial issue in the case." It is unnecessary to resolve these questions, however, because we are satisfied that the prosecutor's comments on the drug test, even if improper, did not cloud a crucial issue in the case.
¶49 Because Ruleau has not convinced us that the real controversy was not fully tried, we decline to exercise our powers of discretionary reversal.

CONCLUSION
¶50 We conclude Ruleau has not established that he received ineffective assistance of counsel. We also conclude he was not prejudiced by joinder of the Brothers Three charges with the Helen's Edgewater Tavern charges. Finally, we reject Ruleau's argument that he should receive a new trial because the real controversy was not fully tried. Accordingly, we affirm.
By the Court.  Judgment and order affirmed.
NOTES
[1] The court sentenced Ruleau to two concurrent terms of fifteen years of imprisonment on the burglary and felony theft charges, with initial confinement of eleven years followed by four years of extended supervision, and a concurrent term of nine months on the criminal damage to property charge.
[2] Under State v. Machner, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), a hearing may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance. At the hearing, trial counsel testifies as to his or her reasoning on challenged action or inaction.
[3] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[4] Ruleau appears to read this testimony as including more than one period of incarceration in the same short time periodMay to the beginning of June. That is not our reading, but, even if Ruleau were correct on this point, our analysis would not differ.
[5] The following exchange took place between the prosecution and Dulak:

Q: Isn't it true, sir, that if I were to ask you any questions about these charges, that you would invoke your Fifth Amendment privilege and will refuse to testify?
A: Well, those would intimidate or incriminate me or
Q: Right. And so your answer is yes, you would refuse to testify about this, correct?
A: Correct.
[6] WISCONSIN STAT. § 904.04(2) provides:

(2) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
WISCONSIN STAT. § 906.08(2) provides:
(2) SPECIFIC INSTANCES OF CONDUCT. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than a conviction of a crime or an adjudication of delinquency as provided in s. 906.09, may not be proved by extrinsic evidence. They may, however, subject to s. 972.11 (2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on crossexamination of a witness who testifies to his or her character for truthfulness or untruthfulness.
[7] The prosecutor argued:

Let's talk about the drug test. You recall when Officer Mabry was on the stand he testified that the corrections officer that was administering the test was in the bathroom with Mr. Ruleau and for fifteen minutes Mr. Ruleau couldn't produce a sample while he was in there. Within two minutes after the officer leaves, he produces a sample. Why was it so easy to produce a sample, ladies and gentlemen? Why was he, after the officer left the bathroom, able to produce a sample? Was he maybe covering up a drug test? I don't know. Wouldn't surprise me.