COURT OF APPEALS
DECISION
DATED AND FILED

November 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1800-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2018CF85**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

ROBERT D. DILYSI,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Rusk County: STEVEN P. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Robert D. Dilysi appeals from a judgment convicting him of two counts of second-degree sexual assault of a child under

sixteen years of age and one count of child enticement. Dilysi argues that the circuit court erroneously exercised its discretion by admitting other-acts evidence of his alleged improper sexual conduct with other young girls as well as evidence found on Dilysi's cell phone of sexually explicit cartoon images featuring young girls. He also claims that his trial counsel was constitutionally ineffective.

¶2 Based upon our independent review of the record, we conclude that the circuit court's decision to admit the other-acts evidence was reasonable and that the evidence was properly admitted under *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), and the greater latitude rule. Further, we conclude that Dilysi has forfeited his ineffective assistance of counsel claims based on his failure to file a postconviction motion in the circuit court. We therefore affirm the circuit court's judgment.

## BACKGROUND

¶3 The charges against Dilysi were based on two allegations made by Emma,[1] a relative of Dilysi. In 2018, Emma disclosed to law enforcement one instance that occurred in 2017, when she was approximately thirteen years old, while she and her younger sister, Kari, were at Dilysi's new home. Dilysi instructed Emma to do chores inside the house while the others were working outside. While Emma was cleaning Dilysi's bedroom, Dilysi entered the bedroom and shut the door, began taking off Emma's clothes, and pushed Emma onto the bed. Emma testified that she tried to move away, but Dilysi "grabbed [her] arm so

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim and the names of other young witnesses in this case. For consistency, we will use the same pseudonyms that the State utilized in its brief. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[she] couldn't." Dilysi then "repeatedly" forced his penis into Emma's vagina while she cried, and he eventually ejaculated on her leg. At trial, Emma testified that she told Kari about the sexual assault after it occurred, but she told law enforcement that "nothing had happened" because she "didn't want anyone to know." She was also worried that she "would be targeted" by Dilysi's mother, Linda Miller, who would "say lies about [Emma]."

¶4     Emma also disclosed a second instance that occurred in 2018, when she was fourteen. She had fallen asleep while babysitting Dilysi's children at her home. Emma testified that she was asleep in bed with the children when she awoke to find Dilysi "at the side of [her] bed" touching her "vaginal area" under her clothing with his fingers and then with his mouth. She "tried to move away and then her sister [Kari] walked in." According to Emma, Kari "was holding a knife and told [Dilysi] that he needed to leave." Dilysi left the room, woke his wife and kids, and they all left Emma's home.

¶5     Based on his conduct against Emma, the State ultimately charged Dilysi in a three-count Information with two counts of second-degree sexual assault of a child under sixteen years of age and one count of child enticement. Prior to Dilysi's trial, the State sought to introduce other-acts evidence pertaining to Dilysi's prior sexual conduct toward Emma, prior sexual conduct toward other young females, and "images of cartoon child pornography saved on" Dilysi's cell phone. Emma allegedly reported in a 2013 interview with law enforcement that Dilysi had walked into a bedroom she shared with Kari "with his penis exposed" and told Kari to leave her underwear off at night because "they were, 'going to have some fun.'" According to Emma, Dilysi then left the girls' room "with his

3

penis in his hand and was wiggling it toward them." Emma stated that when she reported this incident, no one did anything about it.[2]

¶6    The State also sought to admit evidence of specific prior acts against four other young girls, two of whom were also Dilysi's relatives. First, in 2011, Collette, one of Dilysi's relatives, reported to law enforcement that Dilysi had engaged in sexual conduct with her and exposed himself to her when she was around nine or ten years old and was staying with Dilysi and his wife in Tennessee. Collette described several incidents, including one where Dilysi took her to a shed and told her they would play "fashion show," where she would try on "toddler-sized clothes and come out and do tricks for [Dilysi] (cheers, gymnastics, and twirls)." During this incident, Dilysi took pictures of Collette, and he asked her to try on "an invisible outfit," but Collette refused.[3] In another incident, Collette reported that Dilysi chased her around the house with his penis "exposed through the flap of his pajama pants" while stating, "I'm gonna get you."

¶7    In a final incident involving Collette, Collette reported that she had fallen asleep and ended up in bed with Dilysi. She awoke to find Dilysi "lying next to her (on their sides) and [to] him pulling her leg over him with his hand on

---

[2] At trial, while Emma testified that Dilysi exposed himself to her "once," she did not specifically remember this incident, and she did not remember the details of the interview she gave in 2013. Kari did testify that when she was seven, Dilysi told her to leave her underwear off at night. Kari also explained that Miller would tell her that Dilysi "is innocent" and that she and Emma were "lying" when making these allegations.

[3] Although not included in the State's motion, Collette testified at trial that Dilysi referred to "his genital area as a banana" during this incident, and he said things to her "like I would help you if my banana wasn't hurting or I will help you when my banana doesn't hurt anymore or something along those lines." Collette explained that she "didn't understand" and "didn't really think much of it." According to Collette, during the time she was trying on clothes, Dilysi was behind a counter in the shed "shaking" and "sweating a lot."

her butt" and "pushing her vaginal area against his erection." Collette then went into the bathroom and locked the door. At trial, Collette testified that she told her mother about these incidents, and she gave a statement to law enforcement in Tennessee. Collette and her mother ultimately stopped pursuing charges because Miller "harass[ed] and threaten[ed]" them.

¶8 Second, Dilysi allegedly forced sexual contact on Bonnie, Emma's older sister. Bonnie alleged that when she was eight years old, she "was sitting on [Dilysi's] lap" while wearing shorts, and Dilysi touched her vagina with his hands under a picnic table. Although Bonnie told her parents, no charges were issued. At trial, Bonnie also testified that when Miller found out that Dilysi was touching Bonnie, "[s]he told me that I was lying and that I was thinking that it was someone else."

¶9 The third and fourth young girls, ages thirteen and fourteen, were hired by Dilysi to babysit his children. In 2013, both girls reported that Dilysi had tickled them without their permission, and Dilysi admitted to law enforcement that he tickled them in the "upper inner thigh area" but "they were just playing around." According to the State, one of the girls stated that while "she was alone with [Dilysi] in the garage," he gave her "a hickey and kissed her by putting his tongue in her mouth." She also stated that he "put his foot between [her] legs and rubbed her vaginal area while they sat on the couch." The other girl alleged that Dilysi rubbed his buttocks on her vaginal area and told her that if she was sixteen he would be "all over" her. Dilysi was convicted of two counts of disorderly conduct in Price County case No. 2013CM65 for his actions against these two girls.

¶10 Finally, the State sought to introduce evidence of "graphic sexual depictions of cartoon female children" that a forensic examiner discovered on Dilysi's cell phone. The cartoon evidence was discovered after Dilysi was arrested in Tennessee on a warrant issued by the Rusk County Circuit Court, and his phone was seized.

¶11 Dilysi opposed the State's other-acts motion, and the circuit court held a hearing. After determining that the circumstances warranted application of the greater latitude rule and after analyzing the evidence under *Sullivan*, the court granted the State's motion. In particular, the court determined that the other-acts evidence pertaining to other young girls was properly offered for the purposes of establishing motive, intent, absence of mistake, and modus operandi. The court also concluded that the evidence was properly offered to "provide[] a context of this particular crime," and "[i]t also helps bolster the credibility of the victims in this case by showing that Mr. Dilysi has this method of operation, that his intent is to gratify himself sexually [by] perform[ing] sexual acts with these young children."

¶12 As to the sexually explicit cartoons, the circuit court observed that the evidence found on Dilysi's cell phone was cartoons of sexual activity with underage females and that "all of the same assessments apply" to the cartoon evidence, meaning that the evidence was admissible for analogous reasons. As to all the other-acts evidence, the court determined that admitting the evidence would not result in undue prejudice because it was consistent with prior case law and a proper cautionary instruction would ensure that the jury did not consider the evidence for an improper purpose.

¶13    A jury found Dilysi guilty on all counts. The circuit court sentenced Dilysi to ten years' initial confinement followed by ten years' extended supervision on both sexual assault counts, to run consecutively. The court withheld sentence on the child enticement count and placed Dilysi on probation for fifteen years, consecutive to his sentences on the other counts. Dilysi appeals.[4]

## DISCUSSION

### I. Other-Acts Evidence

¶14    Dilysi first contends that the circuit court erroneously exercised its discretion by admitting other-acts evidence of his sexual behavior toward other young girls and cartoon images depicting children in sexual activity. Courts apply *Sullivan*'s three-prong analysis to determine the admissibility of other-acts evidence. *Sullivan*, 216 Wis. 2d at 771. Other-acts evidence is properly admitted if: (1) it is offered for a permissible purpose under WIS. STAT. § 904.04(2); (2) it is relevant under the two relevancy requirements found in WIS. STAT. § 904.01; and (3) its probative value is not substantially outweighed by the risk of unfair prejudice under WIS. STAT. § 904.03. *Sullivan*, 216 Wis. 2d at 772-73.

¶15    Further, "[i]n a sex crime case, the admissibility of other acts evidence must be viewed in light of the greater latitude rule." *State v. Hammer*, 2000 WI 92, ¶23, 236 Wis. 2d 686, 613 N.W.2d 629; *see also* WIS. STAT. § 904.04(2)(b). The greater latitude rule "provides for the more liberal admission of other-acts evidence in child sexual assault cases," *State v. Marinez*, 2011 WI

---

[4]    Although Dilysi filed a notice of intent to seek postconviction relief, he did not file a postconviction motion with the circuit court. Instead, Dilysi filed this direct appeal.

12, ¶16, 331 Wis. 2d 568, 797 N.W.2d 399, and applies to each prong of the *Sullivan* analysis, *State v. Dorsey*, 2018 WI 10, ¶33, 379 Wis. 2d 386, 906 N.W.2d 158.

¶16     We review a circuit court's admission of other-acts evidence for an erroneous exercise of discretion. *State v. Hunt*, 2003 WI 81, ¶34, 263 Wis. 2d 1, 666 N.W.2d 771. We will uphold a court's evidentiary ruling if it "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.* Even if a court fails to set forth the basis for its evidentiary ruling, we will independently "review the record to determine whether it provides an appropriate basis for the circuit court's decision." *Id.*

### a.  Other-Acts Evidence of Sexual Behavior Toward Other Young Girls

¶17     On appeal, Dilysi makes two general arguments as to why the circuit court erred by admitting evidence of Dilysi's sexual behavior toward other young girls. First, he claims that the court failed to do an individual analysis of each item of other-acts evidence and that the court should have "considered that not all of the evidence was similar and that applying a blanket analysis to all of it was erroneous." In particular, Dilysi argues that the incidents involved children of different ages. Further, the incidents involved different alleged behaviors, with some allegations describing Dilysi "exposing himself, in some cases purposely, while others alleged horseplay or other types of activity." Therefore, he argues, the admissibility of each item of evidence should have been considered individually rather than cumulatively.

¶18     The first prong of the *Sullivan* analysis asks whether the evidence was offered for a permissible purpose. Generally, "evidence of other crimes,

wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." WIS. STAT. § 904.04(2)(a). Other-acts evidence may, however, be admitted to demonstrate "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* It may also be admitted to provide context, a complete explanation of the crime, or to bolster the credibility of a witness. *Hunt*, 263 Wis. 2d 1, ¶¶58-59. This first prong is "not demanding" and is "largely meant to develop the framework for the relevancy determination" conducted in the second prong. *Marinez*, 331 Wis. 2d 568, ¶25. "As long as the State and circuit court have articulated at least *one* permissible purpose for which the other-acts evidence was offered and accepted, the first prong of the *Sullivan* analysis is met." *Marinez*, 331 Wis. 2d 568, ¶25.

¶19    In this case, the State offered all the other-acts evidence "to show the context of the charged crimes, and the defendant's modus operandi, intent, motive, and absence of mistake or accident, as well as to corroborate the victim's credibility." The circuit court agreed that these were proper purposes, and we conclude it reasonably determined that the State had satisfied the first prong of the *Sullivan* analysis.

¶20    Dilysi disagrees, arguing that the other-acts evidence was not admitted for a proper purpose.[5] He cites *State v. DeKeyser*, 221 Wis. 2d 435, 585 N.W.2d 668 (Ct. App. 1998), *overruled in part on other grounds* by *State v.*

_____

[5] As noted, Dilysi makes two general arguments on appeal. It is unclear whether Dilysi's arguments relate to the first or second prong of the *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), analysis, or both. Therefore, we will address his arguments under both prongs.

*Veach*, 2002 WI 110, 255 Wis. 2d 390, 648 N.W.2d 447, for the proposition that other-acts evidence is inadmissible to show absence of mistake when his defense was that the sexual assault never occurred.[6]  Dilysi also argues that, under *DeKeyser*, the evidence that he sexually assaulted the victim and others was not properly offered to show a plan unless the State could show that Dilysi intended to violate Emma years earlier.

¶21    We conclude that we need not address these arguments, however, as we need only determine that the circuit court found *one* acceptable purpose to admit the other-acts evidence under *Sullivan*'s first prong.  That standard is clearly met here.  As further discussed below, the other-acts evidence was properly offered to show motive and intent—i.e., Dilysi's motive and intent to have sexual contact with young girls, an element of the charges—and to show Dilysi's modus operandi.

¶22    Turning to the second prong, we conclude that the circuit court also reasonably determined that the State's proffered other-acts evidence was relevant. There are two parts to the relevancy analysis:  (1) "whether the evidence relates to a fact or proposition that is of consequence to the determination of the action"; and (2) "whether the evidence has a tendency to make a consequential fact more

---

[6] In *State v. DeKeyser*, 221 Wis. 2d 435, 585 N.W.2d 668 (Ct. App. 1998), *overruled in part on other grounds by State v. Veach*, 2002 WI 110, 255 Wis. 2d 390, 648 N.W.2d 447, the defendant was charged with sexually assaulting his granddaughter, and the state introduced other-acts evidence that he had touched another granddaughter's breasts four years earlier. *DeKeyser*, 221 Wis. 2d at 439, 441.  DeKeyser alleged that his trial counsel was ineffective by not stipulating to two elements of the crime as "conceding these elements would have rendered the other acts evidence inadmissible because that stipulation would have limited the issue at trial to whether the touching occurred." *Id.* at 441.  On appeal, we agreed that the evidence could not have been used for purposes other than those addressed by the proposed stipulation; thus the evidence was irrelevant. *Id.* at 445-48.

probable or less probable than it would be without the evidence." ***Sullivan***, 216 Wis. 2d at 785-86; *see also* WIS. STAT. § 904.01. "The measure of probative value in assessing relevance is the similarity between the charged offense and the other act." ***State v. Gray***, 225 Wis. 2d 39, 58, 590 N.W.2d 918 (1999). "The probative value of other crimes evidence 'depends partially upon its nearness in time, place, and circumstance to the alleged crime or element sought to be proved.'" ***State v. Davidson,*** 2000 WI 91, ¶75, 236 Wis. 2d 537, 613 N.W.2d 606 (citation omitted).

¶23     We conclude that each of the purposes for which the circuit court admitted the other-acts evidence of Dilysi's sexual conduct toward other young girls relates to a proposition that is of consequence to the determination of the action. First, the evidence was properly admitted to show that Dilysi was motivated to sexually assault Emma based on his sexual interest in young girls. In particular, one count of second-degree sexual assault charged in the Information alleged that Dilysi had "sexual contact" with Emma,[7] which is defined by statute as "intentional touching" of a person's intimate parts "for the purpose of sexually degrading or sexually humiliating the complainant or sexually arousing or gratifying the defendant." *See* WIS. STAT. § 948.01(5)(a); *see also* WIS. STAT. § 948.02(2); ***Hunt***, 263 Wis. 2d 1, ¶60. "Thus [Dilysi's] purpose or motive for allegedly touching [Emma] was one element of the charged crime, and evidence relevant to motive was therefore admissible." *See **Davidson***, 236 Wis. 2d 537, ¶59. Evidence that Dilysi previously had sexual contact with young children is relevant to show that he had sexual contact with Emma for the purpose or with the

---

[7] One count alleged sexual contact, while the second count alleged sexual intercourse.

motive of sexually arousing or gratifying himself. *See id.*, ¶65; *State v. Friedrich*, 135 Wis. 2d 1, 22, 398 N.W.2d 763 (1987).

¶24 Likewise, the same rationale applies to the evidence as it relates to establishing Dilysi's intent. Two of the charges—second-degree sexual assault alleging sexual contact and child enticement—have specific intent elements. *See* WIS. STAT. § 948.01(5)(a) ("intentionally touching"); WIS. STAT. § 948.07 ("Whoever, with intent to commit [sexual contact or sexual intercourse with a child], causes or attempts to cause any child who has not attained the age of 18 years to go into any vehicle, building, room or secluded place …."). Thus, evidence relating to prior sexual conduct toward either Emma or other young girls was properly admitted to show that Dilysi did not touch Emma or lure her anywhere "by accident or mistake, but intended to do so." *See Hunt*, 263 Wis. 2d 1, ¶61.

¶25 The circuit court also recognized modus operandi—or method of operation—as a basis for admissibility. *See State v. Hurley*, 2015 WI 35, ¶64, 361 Wis. 2d 529, 861 N.W.2d 174 ("[T]he other-acts evidence was admissible to establish method of operation through which [the defendant's] plan may be proved because of the similarity between the two acts."). In particular, the court explained that Dilysi made sexual advances by "isolating the females, making sexual comments, doing it to females over which he has some authority, [and] doing it to females who are … of a young age." We agree that the other-acts evidence helped establish a distinctive method of operation to Dilysi's sexual assaults.

¶26 According to the circuit court, the other-acts evidence also helped "show the context of [Dilysi's] crime[s] and to provide a complete explanation of

12

the case." *See* **Hunt**, 263 Wis. 2d 1, ¶58. The other-acts evidence pertained to Dilysi's alleged sexual conduct toward other young girls, including other young relatives, and demonstrated how Dilysi used his authority and control over Emma and the other alleged victims. Further, the other-acts evidence helped explain to the jury Emma's reluctance to report her assaults, as when other family members had reported Dilysi's conduct they were accused of lying or threatened by Miller.

¶27 Finally, as the circuit court recognized, the issue of credibility—i.e., whether the jury believed Emma's allegations—was an issue of consequence in this case. *See* **Hurley**, 361 Wis. 2d 529, ¶¶59, 81; **Marinez**, 331 Wis. 2d 568, ¶34. Thus, the court correctly concluded that the other-acts evidence was admissible to allow the jury to better assess Emma's credibility to determine whether she was telling the truth.

¶28 On the second relevancy issue, we conclude the circuit court reasonably determined that the other-acts evidence proffered by the State shares common characteristics with the charged conduct against Emma, and therefore the evidence had high probative value. As summarized by the court, the allegations: (1) were all directed at young girls under the age of sixteen; (2) all involved girls over whom Dilysi had some level of authority, either as a relative or as an employer in the case of the two babysitters; (3) all involved some type of unwanted sexual behavior, including genital exposure, sexual contact, sexual comments, or sexual intercourse; and (4) most of the other-acts evidence involved Dilysi isolating the victims. Further, the court found that the time frame for all the other-acts allegations was not too remote. As the court recognized, these allegations took place between approximately 2011 and 2018—a span of about seven years—and Emma's alleged sexual assaults occurred in 2017 and 2018.

¶29      As noted above, Dilysi argues that the circuit court failed to conduct an individual analysis of each item of other-acts evidence, asserting that the young girls were of different ages and each of the allegations was dissimilar from the acts alleged against Emma.  We disagree.  The court's discussion on the record identified the key similarities between the other acts and the charged offenses—a proper consideration, *see Hurley*, 361 Wis. 2d 529, ¶84—and ultimately found that each of the elements under *Sullivan* was met.[8]  While Dilysi correctly argues that each item of other-acts evidence presented by the State is not the same as the charged offense, we conclude that there are clear similarities between them, and we agree with the State that any distinctions are without a difference.

¶30      For example, Dilysi has not presented any legal authority for his argument that the different ages of the victims—from approximately seven to fourteen years old—is too wide a range to be considered probative.  We note, in contrast to Dilysi's assertion, that the other-acts evidence admitted in *Davidson* involved a six-year-old girl while the charged crimes involved a thirteen-year-old girl.  *See, e.g.*, *Davidson*, 236 Wis. 2d 537, ¶¶61, 67-68.

¶31      Dilysi also argues that the differences between the other acts and the charged crimes are significant and that, as a result, the circuit court erred in considering them together.  For instance, he claims that "[s]ome [of the girls] alleged [Dilysi] exposing himself, in some cases purposely, while others alleged horseplay or other types of activity."  Dilysi fails, however, to explain *why* any of

---

[8] We conclude that the circuit court conducted a proper *Sullivan* analysis, but to the extent the court's analysis was somehow deficient, we remind Dilysi that our role on appeal is to independently review the record for reasons to uphold the court's determination, and we do so here. *See State v. Hunt*, 2003 WI 81, ¶34, 263 Wis. 2d 1, 666 N.W.2d 771.

these alleged acts would not satisfy the *Sullivan* analysis on its own, except to argue that chasing Collette with his penis out of his pajama pants may have simply been the result of "loose fitting pants" while "it is much more likely that when an adult male touches a child over her vagina that he is not doing so out of carelessness but for a far more sinister reason." However, Collette's allegations did not only involve Dilysi exposing himself. As noted above, all the other-acts allegations involved a sexual component, and our supreme court has stated that a "defendant's past offense need not be identical to the charged offense in order to be probative." *See Davidson*, 236 Wis. 2d 537, ¶72.

¶32 In arguing that the other-acts evidence was not relevant, Dilysi cites only to *DeKeyser* for the proposition that assaults of other young girls are not admissible under *Sullivan*. We conclude that *DeKeyser* is materially distinguishable. Unlike in *DeKeyser*, where the defendant alleged that his trial counsel was ineffective by not stipulating to two elements of the crime, *see DeKeyser*, 221 Wis. 2d at 441, Dilysi does not allege a similar ineffective assistance of counsel claim. Thus, the *DeKeyser* court's reasoning as it relates to relevance is not applicable here.[9]

¶33 We move to the third prong in the *Sullivan* analysis—unfair prejudice—recognizing that the burden is on Dilysi to establish that the evidence's

---

[9] Further, Dilysi cites the *DeKeyser* court's discussion addressing proof of a plan, which is not a purpose asserted by the State in this case. *See DeKeyser*, 221 Wis. 2d at 449-50. Dilysi has presented no other legal authority in support of his argument on this point. Because of the similarities between the other-acts evidence and the charged crimes, and in view of the greater latitude rule, we conclude that the circuit court could reasonably have concluded that Dilysi's alleged acts against the four young girls were probative of Dilysi's motive, intent, absence of mistake or accident, and modus operandi, as well as relevant to context, credibility, and providing a more complete background of the case.

probative value was substantially outweighed by the danger of unfair prejudice. *See* **Hunt**, 263 Wis. 2d 1, ¶69; **State v. Payano**, 2009 WI 86, ¶80, 320 Wis. 2d 348, 768 N.W.2d 832. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." WIS. STAT. § 904.03. In balancing the probative value against the unfair prejudicial effect, "[p]rejudice is not based on simple harm to the opposing party's case, but rather 'whether the evidence tends to influence the outcome of the case by improper means.'" **Hurley**, 361 Wis. 2d 529, ¶87 (citation omitted).

> Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case.

**Sullivan**, 216 Wis. 2d at 789-90.

¶34 Here, we conclude that Dilysi failed to establish that the risk of unfair prejudice substantially outweighed the evidence's probative value. As determined above, the other-acts evidence proffered by the State is highly relevant to issues of consequence in this case and, as such, has a strong probative value. *See* **Payano**, 320 Wis. 2d 348, ¶81. Further, Dilysi has not shown that the evidence would have a tendency to influence the outcome by improper means, as all of the items of other-acts evidence are similar to, if not less serious than, his sexual assaults against Emma. As the circuit court explained, the evidence is "just kind of the classic sexual type activities that we see that the appellate courts and supreme courts have allowed to come in."

¶35 The circuit court also provided a cautionary instruction to the jury regarding the proper basis for considering the other-acts evidence. Such

16

cautionary instructions have been found to "substantially mitigate any unfair prejudicial effect." **Hurley**, 361 Wis. 2d 529, ¶89; *see also* **Dorsey**, 379 Wis. 2d 386, ¶55 ("We presume that jurors follow the instructions given by the court."). Accordingly, given the application of the greater latitude rule in this case, we conclude that the court properly admitted at Dilysi's trial the State's proffered other-acts evidence of sexual conduct toward other young girls.

### b. Cartoon Images Depicting Children in Sexual Activity

¶36     Next, Dilysi argues that the circuit court erred in admitting the sexually explicit cartoon images found on Dilysi's cell phone.  In particular, Dilysi argues that the images "should be treated differently than evidence of other sexually motivated acts, because they are physical evidence" and that the court failed to apply the proper **Sullivan** analysis.  According to Dilysi, the court "did not provide any analysis of the proffered evidence other than to reference [**State v. Normington**, 2008 WI App 8, 306 Wis. 2d 727, 744 N.W.2d 867 (2007)] and comment that the court adopted that case's reasoning."[10]

¶37     In **Normington**, the defendant was charged with sexually assaulting a "developmentally disabled adult" based on "the State's theory that Normington inserted [a] toilet plunger into [the victim's] anus because he had a sexual interest in the insertion of an object into a person's anus." *Id.*, ¶¶1, 4, 7.  The circuit court admitted other-acts evidence of pornographic images and videos found on Normington's computer that "depicted objects being inserted into women's

---

[10] Again, we note that even if we were to conclude that the circuit court's **Sullivan** analysis was somehow deficient, we independently review the record for reasons to uphold the court's determination. *See* **Hunt**, 263 Wis. 2d 1, ¶34.

vaginas and into men's and women's anuses and other sexual images and acts." *Id.*, ¶8. We concluded, after analyzing the *Sullivan* factors, that the court properly exercised its discretion in admitting the evidence to show that Normington was motivated by his sexual interest in inserting objects into body orifices when he assaulted the victim. *Normington*, 306 Wis. 2d 727, ¶¶21, 39. On the issue of relevancy of the pornographic images, we specifically observed that

> [b]ecause inserting a toilet plunger into another person's anus is an unusual thing to do, knowing why a person might be motivated to do such a thing is highly significant to deciding whether Normington did it. A reasonable inference from the evidence that Normington viewed pornography showing the insertion of objects into a person's anus is that he found that practice sexually arousing. A reasonable judge could conclude that this inference makes it more probable that Normington would insert an object into [the victim's] anus than if there were no evidence he had a sexual interest in the insertion of objects into a person's anus.

*Id.*, ¶24.

¶38      We agree with the circuit court and the State that the *Normington* court's reasoning is applicable here and that the images found on Dilysi's cell phone were admissible to demonstrate that Dilysi was motivated to assault Emma by his sexual interest in young girls. *See id.*, ¶¶20-39. Like in *Normington*, a reasonable inference from evidence that Dilysi had pornographic cartoons of young girls on his phone is that he viewed the images because he found them sexually arousing. *Id.*, ¶24. Accordingly, we also agree with the State that the sexually explicit cartoon images of underage female children were properly offered to show Dilysi's motive and intent and to provide context for the charged crimes because they were probative of his sexual interest in Emma, who was also an underage female.

¶39    We also conclude that the sexually explicit cartoon evidence was relevant under *Sullivan*. The circuit court noted that the images "are of sexual activity with young females," and, as discussed above, a reasonable inference from the pornographic cartoon images is that Dilysi had a sexual interest in young female children. *See Normington*, 306 Wis. 2d 727, ¶24. Thus, "[a] reasonable judge could conclude that this inference makes it more probable" that Dilysi would sexually assault Emma than if there was no evidence he had a sexual interest in female children. *See id.* Further, "that same evidence could be reasonably viewed as making it more probable that he did this with the intent to become sexually aroused or gratified than if there were no such evidence." *See id.*, ¶25.

¶40    Finally, we also conclude that the probative value of the sexually explicit cartoons is not substantially outweighed by the danger of unfair prejudice. Similar to the discussion in *Normington*, we agree that, given the charges in this case, Dilysi having an interest in sexually explicit cartoons depicting young girls "is less, not more, disturbing" than actually committing a sexual assault against a young girl. *See id.*, ¶35. Further, unlike in *Normington* where the defendant declined the cautionary jury instruction, in this case, the circuit court provided the cautionary instruction, which is recognized as the accepted way of guarding against the jury's use of other-acts evidence for an improper purpose. *See id.*, ¶36.

¶41    Dilysi argues, however, that *Normington* is distinguishable. First, while Dilysi asserts that there is a "significant" distinction between sexually explicit cartoon images and pornography depicting actual humans, he fails to explain why that is the case. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). We agree with the State that whether the images are of real or cartoon children, they illustrate Dilysi's sexual interest in young girls.

19

Dilysi also argues that *Normington*'s analysis is inapt here because "[t]he cartoon drawings did not depict any of the behavior with which [Dilysi] was charged, but instead showed cartoon poses of young girls with their vaginas exposed and in other sexually provocative positions." He claims that "[n]one of the images depicted penile insertion into a vagina, although one depicted a hand being inserted into a vagina." The court addressed and rejected a similar argument in *Normington*, explaining that the images need not display an assault or the exact circumstances of the crime to demonstrate relevancy. *See Normington*, 306 Wis. 2d 727, ¶¶28-29.

¶42 Dilysi also contends that *Normington* is distinguishable because in that case the victim lacked the capacity to testify. *Normington* did not, however, limit its holding in such a manner, and its analysis is equally applicable in a case with a child victim. *See id.*, ¶19 ("We conclude the circuit court correctly decided that the greater latitude rule was available in cases where the other acts evidence is pornography, not prior sexual assaults, if the adult victim *functions at the level of a child* due to disabilities." (emphasis added)).

¶43 Finally, Dilysi argues that the State failed to offer expert testimony connecting the propensity to view sexually explicit cartoon images of young girls to a greater likelihood that one would assault a young girl, claiming that this propensity argument is the equivalent of saying that someone is more likely to engage in violent acts because they watch violent Looney Tunes cartoons. Again, Dilysi has failed to cite any legal authority for his assertion that expert testimony is required to link the other-acts evidence to the facts of the case, and, further, the *Normington* court did not require such evidence prior to admitting the pornographic evidence. Instead, we conclude that the *Sullivan* factors, in

20

conjunction with the greater latitude rule, support the circuit court's discretionary decision to admit the cartoon evidence.

## II. Ineffective Assistance of Trial Counsel

¶44     For the first time on appeal, Dilysi also argues that his trial counsel provided constitutionally ineffective assistance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In particular, Dilysi argues that his trial counsel performed deficiently by failing to request that the circuit court provide the cautionary jury instruction regarding the other-acts evidence *prior* to the jury hearing the evidence and by failing to properly cross-examine several witnesses. We agree with the State that Dilysi has forfeited these arguments.

¶45     "Claims of ineffective trial counsel … cannot be reviewed on appeal absent a postconviction motion in the trial court." *State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 677-78, 556 N.W.2d 136 (Ct. App. 1996). In particular, "[a] claim of inadequate trial counsel is to be raised by a hearing in the [circuit] court, at which trial counsel can testify concerning the reasons behind actions taken." *State v. Mosley*, 102 Wis. 2d 636, 657, 307 N.W.2d 200 (1981).

¶46     In this case, Dilysi did not file a postconviction motion in the circuit court alleging ineffective assistance of trial counsel. He also failed to raise his ineffective assistance claims at any other time during the circuit court proceedings. In his reply brief, Dilysi does not dispute that he failed to preserve this challenge below. *See State v. Chu*, 2002 WI App 98, ¶41, 253 Wis. 2d 666, 643 N.W.2d 878 (argument raised in State's response brief not disputed in defendant's reply may be deemed admitted). Accordingly, we conclude that Dilysi has forfeited his ineffective assistance of trial counsel claims. *See Rothering*, 205 Wis. 2d at 677-78.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.