COURT OF APPEALS
DECISION
DATED AND FILED

May 16, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP257-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF1029

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ARTHUR G. SIMMONS, JR.,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Eau Claire County: SARAH MAE HARLESS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Arthur G. Simmons, Jr., appeals from a judgment convicting him, following a jury trial, of trafficking a child, as a party to the crime

and as a repeater, and from an order denying his postconviction motion. At trial, Simmons represented himself, but the circuit court appointed standby counsel. Simmons now claims that he is entitled to a new trial based on standby counsel's constitutionally ineffective assistance and the State's discovery violations. For the reasons that follow, we conclude that Simmons has waived these claims, and he is therefore not entitled to the relief he seeks. We affirm.

## BACKGROUND

¶2 The State initially charged Simmons in a criminal complaint with first-degree sexual assault of a child (sexual contact with a child under age thirteen). The charges were later amended by Information to repeated sexual assault of a child, as a repeater, and trafficking of a child, as a party to the crime and as a repeater. The charges were based on a report that Melinda[1] had been allowing adult men to sexually assault her children, Mila and Joshua, and photograph them naked in exchange for money, drugs, and alcohol. According to the complaint, the abuse began when the children were nine and six years old, respectively, and lasted for approximately nine years.

¶3 Law enforcement's investigation of the allegations revealed that Simmons—identified through the use of his nickname, "Junior," and a photograph on his Facebook profile—was one of the men who assaulted Mila. Mila stated that Simmons began having vaginal intercourse with her when she was nine years old. During an interview with law enforcement, Mila reported that Simmons had

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use pseudonyms when referring to the victims and their mother in this case. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

an "indent" on the "back of his thigh near to the buttocks." Given Mila's description, law enforcement executed a search warrant for Simmons' body and took photographs, which showed "pockmarks or types of scars" that were "exactly where [Mila] said they would be."

¶4 Early in the proceedings, Simmons stated his desire to represent himself. At the preliminary hearing, he asserted that he did not want to be represented by appointed counsel and that he was "prepared … to do this myself." At a later hearing, the circuit court conducted a full colloquy with Simmons and confirmed his knowing, intelligent, and voluntary waiver of his right to counsel. At that hearing, the court also stated its intent to appoint standby counsel "because of the serious nature of these charges." The court informed Simmons that standby counsel would be available to answer Simmons' questions, "but you would not have to or in any way be obligated to use them." Once standby counsel had been appointed, the court explained: "[J]ust to briefly let you know, standby counsel is for the convenience of the court. She is there and may provide assistance for when you have questions. It is not the same as having full representation, which you did previously waive. Do you understand that?" Simmons affirmed that he understood.

¶5 Pretrial, the State provided Simmons with discovery in the case, which was admittedly "voluminous." Simmons informed the circuit court that he had received discovery, but he was "not sure if it's, like, all there." The State asserted that it had provided Simmons with a full copy. Simmons expressed his frustration with the discovery, noting that "none of it[']s in order." The court responded, "I understand that discovery can be large and cumbersome. You have a right to discovery. You do not have a right to have it put in any specific order or organized for you by the State." The court advised him to consult with standby

counsel regarding the discovery and follow up if he had specific concerns. At a hearing held the day before the trial began, Simmons again asked how he would be able to resolve his "discovery issues." The court offered to postpone the trial to resolve those issues, but Simmons declined the court's offer.

¶6     On the first day of trial, Simmons expressed his intent to call Melinda as a witness. Melinda's attorney was present, and he informed the circuit court that Melinda would "be invoking her right to remain silent and her right not to incriminate herself to every single question." Her attorney also stated that he did not believe that Melinda had been subpoenaed for trial. According to Simmons, Melinda's subpoena was "brought back to me because she wasn't here," meaning that she was not being held at the same jail facility as Simmons. Because Melinda was not properly served with a subpoena, and given that she likely would assert her Fifth Amendment right not to testify, the court did not order that she be transported for trial. Simmons also stated that he planned to call Joshua, but after a discussion, it came to light that Joshua was also not properly subpoenaed.

¶7     During the three-day trial, Mila, among other witnesses, testified for the State. Mila recounted for the jury the details of her history with Simmons and identified him as one of the men who assaulted her beginning when she was nine years old. According to Mila, her mother abused, traded, exchanged, and sold her and her younger brother Joshua for drugs or money. On cross-examination, Simmons questioned Mila about the marks that she had alleged were on his legs. Mila could not recall exactly where the marks were located, noting that she "was young" and the assaults occurred "like 12 years ago."

¶8     After the State rested, Simmons presented his case. Simmons called several witnesses, and he testified in his own defense. According to Simmons, he

had a casual sexual relationship with Melinda, but he did not have sexual intercourse with Mila or give Melinda drugs or money for that purpose. At one point during his presentation of evidence, Simmons informed the circuit court, outside the presence of the jury, that he planned to call Mila again to ask her whether she told someone that she lost her virginity in 2014. The State objected. The court took a recess, and the State discussed the issue with Mila. The State then informed the court that Mila did not "recall making that statement" and that her perception was that "everything that happened when she was a child wasn't consensual and she doesn't believe she's lost her virginity to a man since becoming an adult." In response, Simmons interjected, "What about Bobby Prosser …? Bobby Prosser, that's another guy that she accused."[2] The court ruled that Simmons would not be permitted to ask Mila about her alleged statement pertaining to when she lost her virginity.

¶9 The jury found Simmons not guilty of repeated sexual assault of a child but guilty of trafficking a child as a party to the crime. The circuit court sentenced Simmons to twenty-five years' initial confinement followed by ten years' extended supervision.

¶10 With the assistance of postconviction counsel, Simmons moved for a new trial based on several theories. As relevant to this appeal, he claimed that he received ineffective assistance of standby counsel and that the State failed to comply with its discovery obligations in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and WIS. STAT. § 971.23(1)(h). Simmons alleged that standby counsel

---

[2] In its response brief, the State noted that "Bobby Prosser" is also referred to as "Bobby Poser" in the record. The State and Simmons both use "Poser" in their briefing before this court, so we will as well.

rendered ineffective assistance by failing to properly subpoena Joshua and Melinda to testify at trial. As to the discovery violations, Simmons claimed that the State failed to provide him with the search warrant application, which prevented him from attacking the validity of the photographs of his legs. Simmons also alleged that the State did not provide the police report pertaining to Mila's sexual assault accusation against Poser, which he alleged he could have used to impeach Mila.

¶11 The circuit court held an evidentiary hearing on the motion. Standby counsel, Simmons, and a prosecutor at Simmons' trial each testified. After hearing arguments from the parties, the court denied Simmons' postconviction motion. As to Simmons' claim of ineffective assistance of standby counsel, the court explained that Simmons was aware of standby counsel's role and responsibilities and "that she wasn't taking on the full scope of representation." On his discovery violation claim, the court observed that it had taken steps to assist Simmons prior to trial with the discovery issues, including offering him a continuance. Regardless, based on the testimony at the hearing, the court did not find that "there was any denial of [a] right to appropriate discovery." Simmons appeals.[3]

---

[3] We note that, on appeal, Simmons filed what he identifies as a "supplemental appellate brief." Simmons, however, is represented by postconviction counsel. The Wisconsin Constitution gives a litigant the right to prosecute or defend a lawsuit in state court "either in his own proper person or by an attorney of the suitor's choice." WIS. CONST. art. I, § 21(2). As a result, we entered an order stating that we would not accept Simmons' supplemental appellate brief.

**DISCUSSION**

¶12    On appeal, Simmons repeats his claims of ineffective assistance of standby counsel and discovery violations.  We conclude that Simmons waived both these claims.  Accordingly, he is not entitled to a new trial on either of these bases.

¶13    We first address Simmons' argument that standby counsel provided constitutionally ineffective assistance.  A criminal defendant has the right to conduct his or her own defense under both the Sixth Amendment of the United States Constitution and article I, § 7 of the Wisconsin Constitution.  *State v. Klessig*, 211 Wis. 2d 194, 203, 564 N.W.2d 716 (1997).  "When a defendant seeks to proceed pro se, the circuit court must [ensure] that the defendant (1) has knowingly, intelligently and voluntarily waived the right to counsel, and (2) is competent to proceed pro se."  *Id.*  If both these criteria have been met, then the defendant's request for self-representation must be granted.  *Id.* at 204.  Nevertheless, "[w]hen a defendant chooses to exercise his [or her] right to self-representation and relinquish his [or her] right to be represented by counsel, the circuit court, acting in its discretion, has the authority to appoint an attorney to act as standby counsel."  *State v. Campbell*, 2006 WI 99, ¶64, 294 Wis. 2d 100, 718 N.W.2d 649.  Standby counsel, however, is "primarily an aid to the circuit court."  *Id.*  Thus, the scope of standby counsel's duties is within the circuit court's discretion. *Douglas County v. Edwards*, 137 Wis. 2d 65, 81, 403 N.W.2d 438 (1987).

¶14    Simmons argues that standby counsel provided ineffective assistance and that we should apply the well-known test for ineffective assistance claims under *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Simmons asserts that

standby counsel took on the duty of filing and serving some subpoenas for him by submitting a subpoena for Joshua to victim-witness advocates. Standby counsel testified before the circuit court that she provided a subpoena for Joshua to a victim-witness advocate because "[t]hat was our best guess on how to get" service on Joshua as a named victim. On the first day of trial, however, the State reported that Joshua had not been served because he was not a named victim in Simmons' case, only in Melinda's case. At that point, standby counsel informed the court that neither she nor Simmons was informed that the victim-witness advocates were not going to accept service for Joshua, but Simmons then admitted that the State had informed him the night before trial that Joshua had not been served. The court responded that "the State did provide the information that [Joshua] was not served, and it's on [Simmons] to get him here tomorrow."

¶15    Joshua never appeared at trial. According to Simmons, Joshua's testimony would have impeached Mila. Specifically, Simmons claims that Joshua's testimony would have been useful to dispute the dates of Mila's allegations and to show that Joshua did not name Simmons as a perpetrator.

¶16    Simmons also claims that Melinda was not served. He does not, however, specifically allege that the failure to serve Melinda was standby counsel's error, noting only that "[a]nother crucial witness for Simmons who was not served was alleged coconspirator [Melinda]." The State also observes: "For reasons that are not entirely clear in the record, [Melinda] was not served with a subpoena prior to trial." Simmons claims that Melinda's testimony was important because it would have been used to impeach Mila, but, as noted above, Melinda's attorney informed the circuit court that she planned to invoke her Fifth Amendment privilege against self-incrimination.

8

¶17 Whether standby counsel was ineffective or not, Simmons has no basis to assert that his constitutional right to effective assistance of counsel was violated as a result of standby counsel's performance. Simmons waived his right to counsel after a proper colloquy with the circuit court. He does not challenge that waiver on appeal. By waiving his right to counsel, he also waived his right to the effective assistance of counsel. *See **Moore v. State***, 83 Wis. 2d 285, 300, 265 N.W.2d 540 (1978) (observing that a defendant has a right to represent himself or herself or a right to be represented by counsel; he or she does not have a right to both); *see also **Faretta v. California***, 422 U.S. 806, 834 n.46 (1975) ("[A] defendant who elects to represent himself [or herself] cannot thereafter complain that the quality of his [or her] own defense amounted to a denial of 'effective assistance of counsel.'"). Wisconsin has not recognized a constitutional right to standby counsel, *see **State v. Cummings***, 199 Wis. 2d 721, 753 n.15, 754 n.17, 546 N.W.2d 406 (1996), nor are we aware of any federal constitutional right to standby counsel, *see **United States v. Windsor***, 981 F.2d 943, 947 (7th Cir. 1992) ("This court knows of no constitutional right to effective assistance of standby counsel."). The decision to appoint standby counsel is made for the convenience of the circuit court. *See **Edwards***, 137 Wis. 2d at 77; ***Cummings***, 199 Wis. 2d at 754 n.17. Therefore, without a constitutional right to standby counsel, there is no basis for a claim that standby counsel rendered ineffective assistance.

¶18 Simmons argues, however, that "[e]ven if standby counsel is not required to do a task, if she takes a task upon herself, she has the duty to complete it." Accordingly, Simmons asserts that because standby counsel "began to serve subpoenas on Simmons' behalf," "[h]er failure to follow through fell below the

performance of a reasonable attorney." We disagree. First, Simmons does not cite any legal support for this proposition.[4] *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Instead, Simmons concedes that ineffective assistance of standby counsel has not been recognized by Wisconsin courts.

¶19 Second, the record does not support Simmons' assertion that standby counsel took over the duty of serving subpoenas. Simmons was told at various points during this case, by both the circuit court and standby counsel, that Simmons "is the attorney in this case" and that he was responsible for properly subpoenaing witnesses. To the extent standby counsel did assist Simmons with any subpoenas, she made it clear that it was done "merely as a courtesy to" him and that "[a]s standby counsel, it is no[t] my responsibility to track down witnesses, speak to witnesses and/or subpoena witnesses."[5] Thus, the record demonstrates that Simmons was responsible for proper service of the subpoenas and that standby counsel did not assume that responsibility. In summary, Simmons waived his right to effective assistance of counsel, and, therefore, he cannot now claim that standby counsel was ineffective.

¶20 Next, we address Simmons' claim that the State violated its discovery obligations. Simmons claims discovery violations under both ***Brady*** and WIS. STAT. § 971.23(1)(h). A defendant has a Fourteenth Amendment due

---

[4] Simmons only cites generally to a law review article written in 2015 for this proposition. *See* Jona Goldschmidt, *Judging the Effectiveness of Standby Counsel: Are They Phone Psychics? Theatrical Understudies? Or Both?*, 24 S. CAL. REV. L. & SOC. JUST. 133 (2015).

[5] Simmons does not advance an argument that he was not acting as his own attorney as a result of unsolicited intrusions by standby counsel. *See **McKaskle v. Wiggins***, 465 U.S. 168, 177 (1984) ("[T]he objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel.").

process right to disclosure of any favorable evidence in the State's possession that is "material either to guilt or to punishment," *see Brady*, 373 U.S. at 87, including disclosure of any evidence that may impeach one of the State's witnesses, *see Giglio v. United States*, 405 U.S. 150, 154-55 (1972). "A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶21 We analyze an alleged discovery violation under WIS. STAT. § 971.23 in three steps. *State v. Rice*, 2008 WI App 10, ¶14, 307 Wis. 2d 335, 743 N.W.2d 517 (2007). First, we determine whether the State failed to make a required disclosure. *Id.* Next, we determine whether the State had "good cause" for the failure. *Id.* Finally, if we determine that the evidence should have been excluded under the first two steps, we decide whether admission of the evidence was harmless. *Id.*

¶22 Simmons identifies two items of evidence that he alleges the State failed to provide to him with the discovery materials. The first item was a police report about Mila's sexual assault accusation against Poser. Simmons stated that he was provided Department of Health Services (DHS) reports in which Mila accused Poser of sexually assaulting her, and the DHS reports mentioned a police report. Simmons testified that he received the DHS reports, but he did not receive the police report until after his conviction. Simmons claims that Poser's testimony would have called Mila's credibility into question. In response, one of the prosecutors testified at the postconviction motion hearing that the police report was, in fact, provided to Simmons in advance of trial. When asked, on

cross-examination, about whether the report was the DHS report or a police report, the prosecutor responded, "My recollection is that it was an Eau Claire Police Department report, but without looking through the paper discovery right now, I couldn't tell you for sure."

¶23 The second item of evidence was law enforcement's application for the search warrant for Simmons' body. The State admits that the actual search warrant application was not provided to Simmons. The prosecutor testified, however, that "the information that made up that search warrant application [was] included in the police reports," which Simmons received. Simmons argues that both of these items of evidence were material, exculpatory, and impeachment evidence and that the State's violations warrant either dismissal or a new trial.

¶24 As noted above, at a motion hearing the day before trial, Simmons informed the circuit court that there were "discovery issues." Simmons did not specify the discovery issues to which he was referring or what specific items he believed were missing. After a discussion with the parties, the court responded:

> The options, if you think there's a discovery violation that impedes your ability to be prepared tomorrow, is we can have the trial moved to a later time to allow you time to review this [evidence] or we can discuss other potential sanctions, for example, if there's something in discovery that [the State] just turned over that [it] intends to introduce.

The court later reiterated that Simmons "would have every right at this point to request a different trial date" to address the discovery concerns and review the evidence. Thus, the court provided Simmons the opportunity to postpone his trial in order to address his continuing discovery concerns.

¶25 Under the circumstances, we conclude that regardless of whether a discovery violation occurred, Simmons has waived[6] that claim. The circuit court provided Simmons information regarding his discovery rights and his options if he believed that the State had violated its discovery obligations. As the court noted in its decision on Simmons' postconviction motion, "Simmons chose to proceed and move forward and not postpone the trial. And acting as his own attorney, that was his right to make such a decision." Therefore, Simmons intentionally chose not to postpone the trial to resolve his claimed discovery issues after being informed of his rights. He cannot now claim a discovery violation as a basis to obtain another opportunity to try his case. *See State v. Counihan*, 2020 WI 12, ¶¶26-27, 390 Wis. 2d 172, 938 N.W.2d 530; *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727 ("[I]ssues must be preserved at the circuit court."). Further, Simmons fails to respond in his reply brief to the State's argument that we should deny his claim on this basis. As a result, Simmons concedes the point. *See State v. Chu*, 2002 WI App 98, ¶41, 253 Wis. 2d 666, 643 N.W.2d 878 (argument raised in response brief and not disputed in reply may be deemed admitted). Simmons waived his claim that the State violated its discovery obligations.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[6] The State suggests that this court could "apply forfeiture principles to Simmons' claims pertaining to discovery." "Although cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts." *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612. "[F]orfeiture is the failure to make the timely assertion of a right" whereas "waiver is the intentional relinquishment or abandonment of a known right." *Id.* Given the facts in this case, waiver is the appropriate term.